**In the Matter of Jared JORDAN, Debtor.**

**In the Matter of Alphonso JONES, Debtor.**

**Bankruptcy Nos. 89–10165, 89–10085.**

United States Bankruptcy Court, D. New Jersey.

July 29, 1991.

David Paul Daniels, Camden, N.J., for debtors.

Elliot Berton, Philadelphia, Pa., for Gen. Motors Acceptance Corp.

## OPINION

JUDITH H. WIZMUR, Bankruptcy Judge.

In these two unrelated chapter 13 cases, the issue presented is the appropriate interest rate to be applied to the allowed secured claim of the secured creditor under 11 U.S.C. § 1325(a)(5)(B)(ii). In each case, the debtor proposes to retain a motor vehicle and to pay to the secured creditor the value of the vehicle over the term of the chapter 13 plan, with ten percent interest. In both cases, the secured creditor is General Motors Acceptance Corporation.

## DISCUSSION

Observers have noted that "[f]ew bankruptcy issues have met with as much confusion as the determination of a proper discount rate" in the context of a chapter 13 confirmation of a plan which crams down a secured creditor's interest. *Valuation in Bankruptcy*, 32 UCLA L.Rev. 1061 (1985). Among the various approaches to the question have been the use of the contract rate between the parties in the origi-

nal agreement[1], the application of a market rate of interest, sometimes reflected by the Treasury bill rate,[2] application of the rate specified under 26 U.S.C. § 6621 of the Internal Revenue Code,[3] the legal rate of interest,[4] and the adoption of a compromise rate between the contract rate and the market rate.[5]

██ The starting point of analysis is the statutory language of § 1325(a)(5), which requires as a condition of confirmation that:

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien secured such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder.

It is commonly recognized that, absent a secured creditor's consent, where a debtor retains property and proposes to pay the allowed secured claim through the plan, the phrase "value, as of the effective date of the plan" requires the debtor to make interest payments through the life of the chapter 13 plan so as "not to dilute the value of [the secured creditor's] claim through delay in payment." *Memphis Bank and Trust Company v. Whitman*, 692 F.2d 427, 429 (6th Cir.1982).

The present value language of § 1325(a)(5)(B)(ii) is virtually identical to the present value language appearing in several other statutory provisions of the Bankruptcy Code, including chapter 11 and chapter 12 provisions. *United States v. Neal Pharmacal Company*, 789 F.2d 1283 (8th Cir.1986), citing *In the Matter of Southern States Motor Inns, Inc.*, 709 F.2d 647, 652 (11th Cir.1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).[6] A review of cases applying the identical language to determine the appropriate discount rate in other contexts is instructive. *In re Aztec Company*, 99 B.R. 388 (Bankr.M.D.Tenn.1989), *reheard* 113 B.R. 414 (Bankr.M.D.Tenn.1990).

In the context of the repayment of priority tax obligations through a chapter 11 plan of reorganization, under 11 U.S.C. § 1129(a)(9)(C), several circuit courts, including the Eighth, Ninth and Eleventh circuits, have determined, with consistent reference to the familiar citation from Collier on the subject,[7] that the proper discount rate is the prevailing market rate for a loan of a term equal to the pay-out period, with due consideration for the quality of the security and the risk of subsequent default. *In re Monnier Brothers*, 755 F.2d 1336, 1339 (8th Cir.1985); *United States v.*

---

1. e.g., *In re Smith*, 4 B.R. 12 (Bankr. E.D.N.Y.1980); *In re Cooper*, 11 B.R. 391 (Bankr.N.D.Ga.1981).

2. e.g., *In re Jewell*, 25 B.R. 44 (D.Kansas 1982); *In re Wilkinson;* 33 B.R. 933 (Bankr. S.D.N.Y.1983); *In re Mitchell*, 39 B.R. 696 (Bankr.D.Ore.1984); *In re Corliss*, 43 B.R. 176 (Bankr.D.Ore.1984).

3. e.g., *In re Crotty*, 11 B.R. 507 (Bankr.N.D.Texas 1981); *In re Strong*, 12 B.R. 221 (Bankr. W.D.Tenn.1981).

4. e.g., *In re Crockett*, 3 B.R. 365 (Bankr.N.D.Ill. 1980); *In the Matter of Johnston*, 44 B.R. 667 (Bankr.W.D.Mo.1984).

5. e.g., *In re Kibler*, 8 B.R. 957 (D.Hawaii 1981).

6. A. Under Chapter 11:

    § 1129(a)(7)(B)
     (a)(9)(B)(i)
     (a)(9)(C)
     (b)(2)(A)(i)(II)
     (b)(2)(C)(i)
B. Under Chapter 12:
    § 1225(a)(4)
     (a)(5)(B)(ii)
C. Under Chapter 13:
    § 1325(a)(4)
     (a)(5)(B)(ii)

7. The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.
*5 Collier on Bankruptcy*, § 1129.03[4][f][i] at 1129–85 (15th Ed.1987).

*Neal Pharmacal Company, supra,* 789 F.2d at 1285; *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1505 (9th Cir.1987) and *In re Southern States Motor Inns, Inc., supra,* 709 F.2d at 651. In other words, the present value rate is the rate of interest that the debtor would pay to borrow a similar amount on similar terms in a commercial loan market at the time the chapter 11 plan is being considered for confirmation. *In re Camino Real Landscape Maintenance Contractors, Inc., supra* at 1506. The circuit decisions under § 1129(a)(9)(C) are generally in agreement that a case by case determination of the prevailing market rate is necessary to determine present value under § 1129(a)(9)(C), taking into account the risk of non-payment, the length of the payment period and the existence and quality of collateral. The Treasury rate, or the interest rate charged against delinquent federal income taxpayers under 26 U.S.C. § 6621, may be indicators of the prevailing market rate, but must be adjusted to consider factors such as risk.

In the context of a non-consensual chapter 11 cramdown of a secured interest under § 1129(b)(2)(A)(i)(II), a substantially similar standard has been applied, that of "the current market rate of interest used for similar loans in the region", determined "at the time the new loan is made", or, in other words, at the time of confirmation. *In re Aztec Company, supra.*

In *Aztec, supra,* Judge Lundin reviewed the testimony received from the experts of the debtor and the secured creditor to reach the conclusion that the appropriate interest rate representing the present value of the creditor's allowed secured claim equalled the interest rate on Treasury instruments of a maturity rate equal to the rate proposed by the debtor, plus two percent to account for the demonstrated risk of the loan.

In the chapter 12 context, in particular, the chapter 12 cramdown provision contained in § 1225(a)(5)(B), the Sixth, Eighth and Ninth circuits have also been consistent in adopting the market approach to

determine the correct cramdown interest rate. *United States v. Arnold,* 878 F.2d 925 (6th Cir.1989); *United States v. Doud,* 869 F.2d 1144, 1145–46 (8th Cir.1989), (Treasury bond plus two percent risk factor) and *In re John Fowler,* 903 F.2d 694 (9th Cir.1990). See also *Travelers Insurance Company v. Bullington,* 878 F.2d 354 (11th Cir.1989), *rehearing den. en banc* 889 F.2d 276 (1989). In a recent pronouncement on the subject, the *Fowler* court explained that although there has been general uniformity in the application of the market approach to the cram down interest rate question, courts have used two approaches to determine the "market" rate.

> One [approach] is for the court to determine the current market interest rate for similar loans in the region. (citations omitted). Under this approach, the court sets the cramdown rate by taking testimony on current market rates regarding loans for the length of time involved, secured by the type of property involved. (citation omitted).

> The second method for determining the appropriate market rate is the use of a formula. Under this approach, the court starts with a base rate, either the prime rate or the rate on Treasury obligations, and adds a factor based on the risk of default and the nature of the security (the risk factor). (citations omitted).

*Id.* 903 F.2d at 697.

In the *Fowler* case, the bankruptcy court below, considering both the market interest rates in the region and the risks associated with the debtor, opted for the formula approach, taking the prime rate at plan confirmation, 8.75 percent, and adding a .75 percent risk factor, an approach the Ninth Circuit generally affirmed. However, the case was remanded for articulation of the bases of the bankruptcy court's determination to add a .75 percent risk factor to the prime rate, as well as to require the bankruptcy court to consider the risk of default and the nature of the security in its determination regarding the applicable market rate.

In the only appellate decision in a chapter 13 cramdown context, the Sixth Circuit held that "in the absence of special circumstances, bankruptcy courts should use the current market rate of interest used for similar loans in the region." *Memphis Bank and Trust Company v. Whitman, supra,* at 431. As other circuit courts have noted in the chapter 11 and chapter 12 context, the theory of the "present value" language "is that the creditor is making a new loan to the debtor in the amount of the current value of the collateral. Under this theory, the most appropriate interest rate is the current market rate for similar loans at the time the new loan is made ..." *Id.* at 431.

To synthesize the appellate case law on the measurement of "present value" in chapter 11, chapter 12 and chapter 13 contexts, circuit courts have opted for a prevailing market rate standard under a "coerced loan" theory—the current rate for similar types of loans in the region, as opposed to a "time value of money" theory. The coerced loan approach:

> ... requires a court to treat a bankruptcy plan like a hypothetical new loan to be repaid over the duration of the plan. The amount of the secured claim would be the 'principal' and the court must set an appropriate 'interest rate to determine what the periodic payments should be.' *In re Shannon,* 100 B.R. 913, 932 (D.C.S.D. Ohio 1989).

Typically, applying the "coerced loan theory", the bankruptcy court is required to review, case by case, the nature of the collateral, the risk of default, and the market interest rates for similar loans, which might include lender costs and profits.

Several problems with this approach must be recognized. First, as Judge Lundin articulated in the chapter 11 context in *In re Aztec Company, supra,* it is difficult to arrive at a current market rate of interest for a hypothetical new loan when there is no market for the loan proposed, no equity in the property and limited opportunity on the part of the debtor to obtain financing outside of the Bankruptcy Code framework.

The allowance of secured claims under 11 U.S.C. § 506 (1985) compels that chapter 11 plans will usually propose to pay allowed secured claim holders an amount exactly equal to the value of the underlying collateral. It follows inevitably that the cram down treatment of a secured claim holder will often involve a 100 percent loan to value ratio. There will be no 'down payment' or post-confirmation equity in the property to protect the lender. The borrower will be a debtor in a chapter 11 case whose credit unworthiness has been fully demonstrated. *Id.,* 99 B.R. at 391.

■ Second, courts have noted that although a commercial loan transaction includes an element of profit, profit is not an appropriate factor to consider in determining present value in a chapter 13 case. *See,* e.g., *In re Mitchell,* 39 B.R. 696, 702 (Bankr.D.Ore.1984), Cf. *In re Cassell,* 119 B.R. 89, 92 (W.D.Va.1990). The Bankruptcy Code protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan. *In re Hudock,* 124 B.R. 532, 534 (Bankr. N.D.Ill.E.D.1991). Third, it must be recognized that § 1325(a) does not, by its terms, require treating the plan like a forced loan. "Rather, it only requires that the plan provide that the 'property to be distributed' have a present value equal to the amount of the claim." *Id.* at 534. Conceptually, the coerced loan theory is somewhat flawed.

A more theoretically sound framework appears to be the "time value of money" approach. As noted above, the Sixth Circuit, the only circuit court expression on § 1325(a)(5)(B)(ii) as it pertains to discount rates, recognized that the purpose of calculating present value on an allowed secured claim was "not to dilute the value of [the secured creditor's claim] through delay in payment." *Memphis Bank and Trust Co., v. Whitman, supra,* 429 (6th Cir.1982).[8]

---

**8.** Notwithstanding the "time value" language, the *Memphis Bank & Trust Company* court applied a coerced loan standard.

Providing compensation to secured creditors for the time value of their secured claims represents a direct means of implementing the present value provision of the statute. *In re Shannon, supra.* Under the time value approach,

> ... the court must strive to generate discount rates based upon the most current and accurate estimates of the present worth of a stream of payments ... *Id.*, 100 B.R. at 932.

■ How do we assess the most current and accurate estimate of the present worth of a stream of payments to compensate creditors for the time value of their secured claim? We have rejected the concept that the debtor's chapter 13 plan represents a new loan transaction between the secured creditor and the debtor entitling the secured creditor to the profits and administrative costs that might be earned in such a transaction. The most accepted chapter 13 framework, explained in Collier below, appears to be to determine the creditor's cost of borrowing and to compensate the creditor for that cost.

> The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position economically as if the debtor exercised the option of surrendering the collateral. Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim, which would be received in full immediately upon confirmation if the collateral were liquidated. Since the creditor is deprived of these funds to the extent they are deferred through the plan, the creditor must obtain them elsewhere, for whatever purposes they were to be used. In view of this purpose, the appropriate discount rate is one which approximates the creditor's cost of funds in its business borrowing. If the holder of an allowed secured claim receives interest which compensates it in full for

any additional interest costs incurred due to the deferral of payment, it is not harmed by that deferral. *5 Collier on Bankruptcy*, § 1325.06, at 1325–37 (15th Ed.1987).[9]

We find another useful explanation of the "cost of funds" rationale as the basis for choosing the appropriate market indicator for present value in *In the Matter of Willis*, 6 B.R. 555, 563 (Bankr.N.D.Ill. E.D.1980), as follows:

> For the most part, the Bankruptcy Courts will be dealing with finance companies which do not have large amounts of static capital to finance installment contracts. Those companies go into the money markets on a continuing basis to obtain the money which they use for current loans. In broad terms, their consumer finance business consists of borrowing money in public money markets at current rates and re-lending it to consumers at slightly higher rates.... If the finance company should be authorized a rate less than its borrowing costs, the future value will not be equivalent to the present value; it will be less. If the finance company is authorized a rate greater than its borrowing costs, it is making a profit on the delay and will be receiving more than the present value of the collateral.

Cf. *In re Cassell*, 119 B.R. 89 (W.D.Va. 1990) ("cost of funds" analysis criticized).

■ We conclude that the market rate time value of money is most accurately measured for chapter 13 present value purposes by the cost of funds approach, which seeks to compensate the creditor at a rate equal to the creditor's cost of borrowing to replace funds that would otherwise be available upon liquidation of its collateral.

■ We turn to a review of various market indicators to select the best estimate of a creditor's cost of borrowing. In selecting a particular measure of a creditor's cost of

---

**9.** In *In re Mitchell*, 77 B.R. 524, 527–528 (Bankr. E.D.Pa.1987), Judge Scholl highlights the different Collier analysis between the "present value" requirement of § 1325, presented from a debtor vantage point, i.e., the creditor should get no more than the cost of his own money, plus perhaps a slight adjustment for risks, and no profit, versus the analysis of the "present value" requirement of § 1129(a)(9)(C), presenting a creditor vantage point, i.e., the creditor should be compensated as if the chapter 11 plan represented a voluntary loan situation.

funds for uniform application in chapter 13 cases, we intend only to select a market indicator as a guideline for "present value" § 1325(a)(5)(B) purposes. Debtors and secured creditors must be afforded the opportunity in every case to establish special circumstances to justify the application of a different interest rate in a particular case. However, in the high volume, low budget chapter 13 context, the need, absent specific evidentiary showing, to establish a rebuttable formula for present value to all similarly situated secured creditors by reference to a particular market indicator, which is readily available to all litigants, is obvious.

Many secured claims in chapter 13 involve small amounts; requiring testimony and other evidence to prove the proper discount rate for each claim imposes a wasteful and unnecessary burden on the debtor, the creditors, and the bankruptcy court itself. *In re Cassell, supra,* 119 B.R. at 94.

Among the market indicators selected by the courts are the following:

1. *Treasury instruments, including Bonds, Notes and Bills.*

Treasury instruments are generally considered to represent a risk-free investment, reflective of the interest rate the government pays to borrow money, to which a risk factor must be added for present value purposes. In the *Matter of Doud,* 74 B.R. 865, 868 (Bankr.S.D. Iowa 1987), aff'd., *United States v. Doud,* 869 F.2d 1144 (8th Cir.1989).

Treasury bills are auctioned on a weekly basis, for various short-term intervals up to a maximum maturity of fifty-two weeks. It has been opined that "3 month [Treasury] bills represent the best gauge of the current cost of short-term money, and for that reason they have been chosen as the best rate for establishing the future equivalent of present value." *In the Matter of Willis, supra,* 6 B.R. at 563.

Treasury bonds reflect maturity terms that extend from one to thirty years. Bonds are traded daily, and yields are reported daily by a number of sources, including most large newspapers. In the *Matter of Doud, supra,* 74 B.R. at 868.

2. *Prime Rate.*

"Prime rate" has been defined as the "first rate charged by commercial banks to prime commercial loan customers", *In re Fisher,* 29 B.R. 542, 548 (Bankr.D.Kan. 1983) (citation omitted), or "the actual cost of money for a reliable borrower", reflecting prevailing market rates. *In re Hudock, supra,* 124 B.R. at 534.

3. *Statutory Rates.*

Some courts have opted to rely on post-judgment interest rates established by state or federal statutes, *see, e.g., In re Johnston,* 44 B.R. 667, 670 (Bankr.W.D.Mo. 1984), or on the rates specified for repayment of delinquent tax obligations in 26 U.S.C. § 6621. The circuit courts have generally rejected reliance on statutory rates to establish present value, on the grounds that the rates may not be reflective of current prevailing market rates and may be reflective of objectives other than those of bankruptcy law. *See, e.g., In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503 (9th Cir.1987).

██ We conclude that the most current and accurate estimate of the present worth of a stream of payments to a secured creditor, as measured by the creditor's cost of borrowing, is the prime rate, or the rate at which the creditor borrows money to replace the funds that would otherwise be realized from liquidating its collateral. Unlike Treasury obligations, reflecting the government's cost of borrowing, the prime rate reflects the cost of money, ascertainable on a daily basis, to commercial borrowers. As the *Hudock* court, which also selected the prime rate as the appropriate rate to reflect present value, recognized, although the prime rate may be imprecise in terms of the actual cost of borrowing to a particular creditor at a particular point in time, the advantages of this market indicator, that it is "quickly and easily ascertainable and it is a commercial—rather than governmental or retail—borrowing rate"

outweigh the disadvantages. *Id.* 124 B.R. at 534.

■ We also conclude that the prime rate, as the presumptive market indicator of present value for 11 U.S.C. § 1325(a)(5)(B)(ii) purposes, which may be varied upon special evidentiary showing, should not be enhanced by a risk of default factor. It is recognized that generally an interest rate serves the dual purpose of compensating a creditor for the delay in payment, and of compensating the creditor for the risk of non-payment over the life of the loan. *In the Matter of Willis, supra,* 6 B.R. at 559. The prime rate only includes a risk of default component, as well as profit and transactional costs, as between the secured creditor and its lender. It does not include the risk to the secured creditor inherent in the chapter 13 deferral of payments process. Nevertheless, we decline to enhance the prime rate by a percentage allocation for risk of default for several reasons. First, such an assessment "necessarily involves either arbitrary speculation or ongoing financial risk assessment by the courts", involving extensive empirical demonstrations which may not be available. *In re Hudock, supra,* 124 B.R. at 534. Secondly, as the *Hudock* court also points out, if we reject the coerced loan theory, we must recognize that the § 1325(a) language does not contemplate the risk of non-compliance with the plan. If the debtor complies with the chapter 13 plan, the creditor will be fully compensated for the delay in payments by the interest rate, which reflects its borrowing cost. On the other hand, if the debtor defaults, the creditor, who has retained its lien on the property, may seek relief from the automatic stay to pursue its state court remedies of repossession and liquidation.

■ In selecting a formula, the prime rate, for § 1325(a)(5)(B)(ii) present value purposes, as a rebuttable presumption, it must be recalled that the role of the bankruptcy court is to consider debtor's proposed chapter 13 plan, together with any objections of parties in interest, to determine the confirmability of the plan. Accordingly, if the debtor proposes a present value designation that differs from the guideline suggested here, debtor's plan must be reviewed within the theoretical framework outlined to determine confirmability.

■ To summarize, the following is concluded. The discount rate for § 1325(a)(5)(B)(ii) present value purposes is the prevailing market rate. Under the time value of money approach, the most current and accurate market estimate of the present worth of a stream of payments, measured by the cost of borrowing to the secured creditor, is the prime rate.[10] The prime rate will serve as a rebuttable presumption of present value. Upon proper evidentiary showing, a chapter 13 debtor or objecting secured creditor may propose other alternatives for present value assessment.

In both of the cases presented here, we must review whether the ten percent interest rate proposed by the debtors in each case exceeds the prime rate on the respective confirmation date. The parties are offered the opportunity to review the prime rate on the respective dates of confirmation of the two cases. If the prime rate was less than the interest rate proposed by the debtors, the objections of the secured creditors to confirmation in both cases are overruled, and the debtors' proposed plans may be confirmed.

Debtors' counsel shall submit orders in conformance herewith.

---

**10.** The applicable prime rate here will be the prime rate reflected in the Wall Street Journal, which represents a compilation of the prime rate of 20 major nationwide lending institutions.