**In re GENERAL DEVELOPMENT CORPORATION, et al.,**
**Debtors.**

**Bankruptcy No. 90–12231–BKC–AJC.**

United States Bankruptcy Court,
S.D. Florida.

Dec. 20, 1991.

William J. Perlstein, Wilmer, Cutler & Pickering, Washington, D.C., for debtors.

## MEMORANDUM OPINION ON OBJECTIONS OF THE COUNTY TAX COLLECTORS

A. JAY CRISTOL, Bankruptcy Judge.

■ This matter came before the Court upon objections to confirmation filed on behalf of the tax collectors of St. Lucie, Hendry, St. Johns, Glades, Indian River, and Sarasota Counties (collectively, the "County Tax Collectors"). The County Tax Collectors, joined by Charlotte County, object to section 5.2.3 of the Second Amended Joint Plan of Reorganization (the "Plan") of General Development Corporation ("GDC" or the "Debtor"). Section 5.2.3 provides that 1989 and 1990 secured property tax obligations of the Debtor are to be paid in full in ten semiannual installments at a rate of interest to be determined by the Court pursuant to provisions of the Bankruptcy Code (the "Code") applicable to secured claims. For the reasons stated below, the Court concludes that the Debtor's proposed treatment of the Debtor's secured 1989 and 1990 tax obligations is fully consistent with Section 1129(b)(2)(A) of the Code.[1]

### I. BACKGROUND

Under Florida law, property taxes are secured by a first lien on the property against which the tax is assessed. Fla. Stat. § 197.122. The lien attaches January 1 of the year that the taxes are levied. *Id.* Taxes become due and payable on November 1 of the year in which they are assessed, and are delinquent on April 1 of the following year. *Id.* § 197.333; *Church of Scientology of California v. Schultz*, 371 So.2d 502, 503 (Fla.App.), *cert. denied*, 379 So.2d 203 (Fla.1979). If property taxes are delinquent 60 days, the county may sell tax certificates in an advertised tax sale to the bidder who bids the amount of the delinquent taxes plus accrued interest, charges, and costs, and who demands the lowest interest rate on the certificate after the sale. Fla.Stat. §§ 197.402(3), 197.432(5). If no bidder exists, the certificate is issued to the county at the maximum statutory 18 percent interest rate. *Id.* § 197.432(5).

The delinquent taxpayer may redeem the certificate at any time from April 1 of the year in which the certificate was issued by paying the delinquent taxes plus interest and costs. *Id.* § 197.472(1). The third party certificate-holder will then receive the proceeds plus accrued interest at the rate bid. *Id.* If the certificate has not been redeemed, the certificate-holder may apply for a tax deed at the end of the two-year period beginning on April 1 of the year of issuance. *Id.* §§ 197.472(6) and 197.502(1). If a certificate-holder does not apply for a tax deed within seven years of delinquency, the certificate is declared void. *Id.* § 197.-482(1).

At the time these cases were commenced, GDC was the largest land developer in Florida, holding, among other assets, over 93,000 acres of land. On April 1, 1990, GDC's 1989 property taxes became delinquent. In part because of its inability to pay these taxes, GDC and certain of its subsidiaries filed petitions for relief under Chapter 11 of the Code on April 6 and 12, 1990. On May 23, 1990, upon the motions of certain tax collectors, this Court entered orders granting such tax collectors relief from the automatic stay to allow the sale of 1989 tax certificates on properties of the

---

1. The sole question presented here is that of the proper treatment of Class 2.3 Claims for the period beginning on the Effective Date of the Plan (the "Post–Confirmation Period"). The Debtor has stipulated that the interest rate applicable to secured property tax claims for the period from the filing of the Petition until the Effective Date (the "Petition Period") shall be the statutory rate or the rate bid by third-party certificate-holders, as the case may be. The Debtor has also agreed, upon the presentation to

GDC by the County Tax Collectors of lists of third-party certificate-holders, to handle the administrative task of making the semiannual payments directly to such holders. *See* Statement of William Perlstein, Esq., 12/12/91 Confirmation Hearing Transcript at 36 (hereinafter, "Hearing Tr."). This agreement eliminates any argument by the County Tax Collectors that the Plan imposes undue administrative burdens on them.

Debtor. During June 1990, the tax collectors who had been granted stay relief proceeded with their respective sale of tax certificates on the Debtor's properties (the "GDC Tax Certificates"). According to the two witnesses presented by the County Tax Collectors, purchasers of such certificates were aware of the pendency of the bankruptcy of GDC.[2]

On April 1, 1991, GDC's 1990 taxes became delinquent. A similar sale of 1990 GDC Tax Certificates occurred in June 1991 after entry of a second lift stay order.

## II. DISCUSSION

■ The Plan provides that the holders of prepetition secured claims in Class 2.3 of the Plan, which includes both the County Tax Collectors and the third-party certificate-holders, will receive deferred payments of their claims in ten semiannual payments with interest accruing from the Effective Date at "such rate of interest as may be required by Section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, which rate of interest shall be fixed in the Confirmation Order." The County Tax Collectors and certificate-holders object, arguing that the appropriate rate of interest on Class 2.3 Claims after confirmation would be 18 percent per annum (in the case of unsold certificates) or the rate bid (in the case of third-party certificate-holders).[3] For the reasons set forth below, the Court holds that the proper rate is a fixed, market rate for secured loans comparable to those effectively being made by holders of Class 2.3 Claims to the Reorganized Company, not the rates set pursuant to Chapter 197 of the Florida Statutes.

**2.** *See* Testimony of Dorothy J. Conrad, the St. Lucie County Tax Collector ("Conrad"), Hearing Tr. at 41, 53–54; Testimony of Irving W. Wheeler, an individual who purchased approximately $420,000 worth of GDC Tax Certificates ("Wheeler"), Hearing Tr. at 86.

**3.** To the extent that the County Tax Collectors object to the provision under the Plan for deferred payment of secured tax claims, irrespective of the interest rate (*see* Statement of Leslie Cloyd, Esq., Hearing Tr. at 30–31; Conrad Testimony, Hearing Tr. at 42–44), and seek instead to have those obligations ride through the bankruptcy unchanged, their objection is clearly

### A. "Cramdown" Generally

Because the holders of Class 2.3 claims did not accept the Plan, the "cramdown" provisions of the Code must be satisfied with respect to this Class if the Court is to confirm the Plan. Under Section 1129(b) of the Code, this Court must confirm the Plan notwithstanding the failure of a class to accept the Plan, as long as the Plan is "fair and equitable" as to that class of claims. Section 1129(b) provides that the Plan is "fair and equitable" as to a class of secured claims if:

> (I) ... the holders of such claims retain the liens securing such claims, ... and

> (II) ... each holder of a claim of such class receive[s] on account of each claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of the holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i).

As to the first requirement of Section 1129(b)(2)(A)(i)—retention of the lien securing the obligation—there does not appear to be any dispute that the Plan satisfies this test. *See* Plan, § 5.2.3; First Amended Disclosure Statement at 52 (the "Disclosure Statement").

■ The dispute between the parties, therefore, focuses on what the appropriate rate of interest would be to satisfy the standard of Section 1129(b)(2)(A)(i)(II) of the Code. That section generally requires that, when deferred payments on a secured claim are to be made, interest on the deferred payments must be set at such a rate

without merit. Although the Code includes certain special provisions relating to unsecured tax claims, *see* 11 U.S.C. § 507(a)(7), it contains no comparable provision for secured tax claims. Therefore, to the extent that the County Tax Collectors argue that Section 1129(b)(2)(A) of the Code and Chapter 197 of the Florida Statutes are in conflict, the Code provision must prevail. To hold otherwise would allow state legislative enactments to "preempt" the provisions of the Code and could largely vitiate the "fresh start" those provisions are intended to impart.

as will discount future payments on that secured claim to yield a present value, as of the effective date, equal to the amount of the claim.

### B. Determining the Appropriate Rate of Interest under Section 1129(b)(2)(A)(i)(II) of the Code

#### 1. *Statutory Rates.*

■ The County Tax Collectors argue that the appropriate rate of interest on unsold tax certificates is the 18 percent rate set by Florida Statute. It is well established, however, that statutory interest rates—whether set by state or federal non-bankruptcy law—are not determinative of, and are usually not even relevant to, what interest rate on deferred payments will discount future payments on a claim to yield a present value equal to the amount of the claim.[4]

The analysis of the issue presented here is governed by the Eleventh Circuit decision in *In re Southern States.* In that case, the Internal Revenue Service (the "IRS") argued that the appropriate rate of interest on its deferred priority tax payment was the statutory rate provided for under 26 U.S.C. § 6621.[5] Based on section

6621, the IRS claimed entitlement to 12 percent interest. 709 F.2d at 649–50. The bankruptcy court agreed that the statutory rate was relevant (though it reduced that rate by one percent in the interest of rehabilitating the debtor). The Eleventh Circuit reversed, concluding that the section 6621 rate did not "correspond with the prevailing market rate" in effect at the time of confirmation. *Id.* at 651–52.

Nor should the statutory interest rate be considered when it explicitly or implicitly contains a punitive element that is "inimical to financial rehabilitation of the debtor," and "contrary to the purposes of the Bankruptcy Code." *In re Camino Real,* 818 F.2d at 1507 n. 2. Here, to impose the 18 percent statutory rate—a rate far in excess of the prevailing market rate necessary to preserve the value of the claims in question—would clearly be punitive and would severely impair the rehabilitation of GDC under the Plan. Moreover, where most other creditors, unlike Class 2.3 Claimants, will receive substantially less than 100 percent of their claims, it would be contrary to the purposes of the Code to burden the estate with a punitive rate of interest that will come directly from the

---

**4.** The Courts of Appeals are unanimous on this subject. *See, e.g., In re Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503 (9th Cir.1987); *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986).

Many bankruptcy courts have likewise rejected the relevance of statutory interest rates for Section 1129 purposes, including several instances of 18 percent statutory rates. *See, e.g., In re Fi-Hi Pizza, Inc.,* 40 B.R. 258, 270 (Bankr. D.Mass.1984) (Massachusetts statute requiring *18 percent* interest is irrelevant to determination of interest for priority tax claims); *In re Roxbury Residential Associates, Inc.,* 35 B.R. 348, 350 (Bankr.D.Conn.1983) (Connecticut statutory rate of *18 percent* for delinquent taxes "has no apparent relationship to current market conditions" and is rejected because it is "ill suited to meet the objectives of the Code"); *In re Bantam,* 120 B.R. 530, 531–32 (Bankr.D.Neb.1990) (rejecting Nebraska tax statute as basis for post-confirmation interest, and holding instead that market rate prevails); *In re Busone,* 71 B.R. 201, 204–05 (Bankr.E.D.N.Y.1987) (rejecting rate of 12 percent specified in Suffolk County Tax Act

as basis for post-confirmation interest); *In re Cooper,* 124 B.R. 797, 799 (Bankr.D.Neb.1990) (while Nebraska tax statute governs postpetition interest, market rate governs post-confirmation interest).

**5.** Although *In re Southern States* construed Section 1129(a)(9) of the Code, the relevant portions of that provision and of Section 1129(b)(2)(A)(i)(II) are virtually identical. Section 1129(a)(9) provides in respect of section 507(a)(7) priority tax claims—just as Section 1129(b)(2)(A)(i)(II) provides in respect of secured tax claims—that a plan should be confirmed if the holder of such a claim will "receive on account of such claim deferred cash payments ... of a value, as of the effective date of the plan," equal to the amount of the claim (in the case of priority tax claims) or the value of the security interest (in the case of secured claims). The courts tend to treat the present value standard in these provisions as virtually identical. *See, e.g., In re Camino Real,* 818 F.2d at 1504 (§ 1129(a)(9)(C) analysis useful to courts in considering analysis of secured claims); *Neal Pharmacal Co.,* 789 F.2d at 1285 (language of § 1129(b)(2)(A)(i)(II) virtually identical to § 1129(a)(9)(C) and analysis should be same).

distributions that would be made to such other creditors. Since the 18 percent rate is "reflective of objectives other than those of bankruptcy law," *In re Jordan*, 130 B.R. 185, 191 (Bankr.D.N.J.1991), it should have no relevance to the determination of market rate for purposes of calculating the present value of the secured tax claims under the Plan.

Based on *In re Southern States* and other cases cited above, and because the statutory rate at issue is even less tied to market forces than the one at issue in that Eleventh Circuit decision,[6] this Court concludes that the statutory rate of 18 percent provided for by Chapter 197 of the Florida Statutes is irrelevant to the determination of the appropriate rate of interest for purposes of Section 1129(b)(2)(A)(i)(II) of the Code.

### 2. *Rates Bid by Third–Party Certificate–Holders pursuant to Florida Statute.*

■ For several reasons, the interest rate bid by third-party certificate-holders pursuant to Fla.Stat. §§ 197.402(3), 197.-432(5) is likewise not determinative of the market rate for Section 1129(b)(2)(A)(i)(II) purposes. Most importantly, in computing the relevant interest rate for purposes of Section 1129, the Eleventh Circuit, in *In re Southern States*, looked to the "prevailing market rate for comparable ... loans." 709 F.2d at 653. The Court instructed that:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of

**6.** Unlike 26 U.S.C. § 6621, which is determined by the U.S. Secretary of the Treasury on a periodic basis, the maximum 18 percent rate under Fla.Stat. § 197.172 does not vary at all.

**7.** Similarly, the Court of Appeals for the Ninth Circuit stated in *In re Camino Real:*
> [T]he rate of interest on deferred taxes should be the rate of interest that the debtor would pay to borrow a similar amount on similar terms in the commercial loan market. The

the security and the risk of subsequent default.

*Id.* at 651 (quoting 5 *Collier on Bankruptcy*, ¶ 1129.03 at 65 (15th ed. 1982)).[7]

The tax certificates held by the counties and various third parties, however, are not in any way comparable to the forced "loan" effectuated by the Plan. For example, the Plan provides for semiannual installments of principal and interest. This Court has found that the Plan is feasible and that, based on the Debtor's projections, the required payments will be made. Accordingly, it is expected that the holder of a tax certificate claim will be paid in full without the need for the holder of the claim to take any further action. Quite unlike the holder of a Class 2.3 Claim, the purchaser of a tax certificate in effect commits to tie up its funds for a minimum of two years with no payment of current interest or principal. As Mr. Wheeler testified:

> After two years, if the owner of the property has not paid you, then you have the option of going in and applying for a tax deed, and that is the occasion when you must bring up all of the other taxes, penalties, interest, advertising costs, and it must be readvertised in the paper and put up for a public sale, and you, of course, bid in whatever amount you have invested in the certificate and costs.

Hearing Tr. at 90. Even if a certificate-holder succeeds in securing a tax deed, that party does not necessarily have a saleable product—often a quiet title suit must be brought or title insurance found for the property in question. *Id.* at 84–85. While the foregoing may explain why high rates of interest are often bid for tax certificates, it does not justify the maintenance of those rates under the terms provided for payment of Class 2.3 Claims.

debtor's characteristics determine the interest rate.... *The fact that a particular debt arises from taxes due to the government does not affect the appropriate interest rate. It continues to be determined by the commercial loan market.*
818 F.2d at 1506 (emphasis added). *See also Neal Pharmacal Co.*, 789 F.2d at 1285; *In re Jordan*, 130 B.R. at 188.

The rate bid for the tax certificates is not relevant to Section 1129 for other reasons as well. As the testimony of Mr. Wheeler made clear, the rate he bid to acquire GDC Tax Certificates was based at least in part upon his own cost of funds. With full knowledge of the bankruptcy, he sought to earn "arbitrage" profits by borrowing at one rate and lending to GDC at another.[8] Section 1129(b), however, "protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan." [9]

Lastly, the bid rate is not relevant because the proper rate must be determined "as of the effective date." *See* 11 U.S.C. §§ 1129(a)(9), (b)(2)(A)(i)(II). The rates bid on the 1989 and 1990 GDC Tax Certificates, however, were set in June 1990 and June 1991, respectively—not "as of the effective date." [10]

■ The County Tax Collectors have not cited any authority contrary to the cases discussed herein. Instead, they rely principally on the fact that this Court entered certain orders lifting the automatic stay to permit the sale of GDC Tax Certificates pursuant to Chapter 197 of the Florida Statutes. However, the orders in question are fully consistent with the treatment of secured property tax claims under the Plan.

The orders applicable to the 1989 taxes authorized the Tax Collectors to follow the procedures set forth in Chapter 197 only "up to the issuance of a tax deed" and required that the Tax Collectors "must come back to this Court for further relief from the stay" if the Court still had jurisdiction at the time tax deeds could be issued, i.e., April 1, 1992.[11] Any purchaser of 1989 GDC Tax Certificates, therefore,

was on notice of the pendency of GDC's bankruptcy case and that the purchaser's rights under the tax certificates were subject to further action by this Court. Here, any purchaser of a 1989 GDC Tax Certificate should effectively receive the benefit of its bargain; since the Effective Date is projected to be on or about March 31, 1992, the purchaser will receive the interest it bid on the certificate for the full two-year period prior to April 1, 1992. (*See* note 1 *supra.*) For periods after the Effective Date, as to which the holder would have had to obtain further action by this Court in any event, the holder will receive the full value of its secured claim, as determined pursuant to Section 1129(b)(2).

As to the 1990 GDC Tax Certificates, the applicable lift stay order expressly provided that "[t]he Tax Collectors and any Certificate holder will at all times be bound by orders of this Court [including] any order confirming a plan of reorganization." [12] The first Joint Plan of Reorganization of the Debtor, which included a treatment of secured property tax claims similar to that contained in the final Plan, was filed on May 31, 1991, before any tax sales in June 1991. Accordingly, any purchaser of 1990 GDC Tax Certificates was on notice that the Plan might provide for a rate of interest different from that set pursuant to Chapter 197. Under the Plan, that holder will receive the certificate rate for almost one year, and thereafter the full value of its secured claim.

### 3. *Comparable Market Rates.*

■ In light of *In re Southern States* and the discussion above, the relevant transaction upon which to focus is not the purchase of the certificates, but rather the

---

**8.** *See* Wheeler Testimony, Hearing Tr. at 96, 105–06.

**9.** *In re Jordan,* 130 B.R. at 189 (citing *In re Hudock,* 124 B.R. 532, 534 (Bankr.N.D.Ill.1991)); *see also In re Camino Real,* 818 F.2d at 1506 ("The creditor's characteristics are irrelevant.").

**10.** In refusing to apply the section 6621 rate in *In re Southern States,* the Eleventh Circuit relied in part on the fact that such rates could be almost two years behind market rates and con-

cluded, "in view of recent fluctuations in interest rates, it is obvious that the [section] 6621 rate will often differ significantly from actual market rates." *Id.,* 709 F.2d at 652.

**11.** *See, e.g.,* Order Granting Motion of St. Lucie County Tax Collector for Relief from the Automatic Stay ¶ 2 (May 23, 1990).

**12.** Amended Order Approving Stipulation for Stay Relief Concerning Sale of Certificates for 1990 Taxes ¶ 3 (July 24, 1991).

fully secured "loan" made to the Debtor by the certificate-holders for the five-year period of the payout under the Plan.

■ At the hearing on confirmation of the Plan, the Debtor provided expert testimony from Peter A. Martosella, Jr., a managing director of The Palmieri Company and an expert in bankruptcy reorganization, regarding the appropriate interest rate on a "loan" substantially on the terms of that being made by the County Tax Collectors and the third-party certificate-holders. Mr. Martosella testified:

> Of course, this obligation would not be considered riskless, but given my knowledge of the status of. this plan, the assets, the net assets that would be available for distribution, the fact that this obligation would come before virtually any other payment, there is very little risk in the ultimate receipt of this payment.

> So, with respect to considering a market rate of this interest and beginning with a money rate, say, of 6.2 percent, and then considering some risk factor, I think a rate of—I believe in my judgment that a rate of prime plus one is reasonable and appropriate.

Hearing Tr. at 68. On the other side, the County Tax Collectors presented only the testimony of Mr. Wheeler, who conceded that the characteristics of tax certificates and the treatment of a Claim in Class 2.3 are quite different. *See* Wheeler Testimony, Hearing Tr. at 94. Although Mr. Martosella's view is consistent with case law that takes the prime rate as a starting point,[13] this Court believes—consistent with *Neal Pharmacal Co.*, 789 F.2d at 1286— that a floating rate of interest would be impracticable.

### III. CONCLUSION

Accordingly, for the reasons set forth above, the Court concludes (1) that the rate of interest on tax certificates set pursuant to Chapter 197 of the Florida Statutes is not determinative of the proper rate of interest for Claims within Class 2.3 under Section 1129(b)(2)(A)(i)(II); (2) that the appropriate rate would be a market rate for a comparable "loan" of a term equal to that of the payout period on Class 2.3 Claims, with similar payment terms, and with due consideration for the security and risk of subsequent default; and (3) that the appropriate rate should be a fixed interest rate. Because the only testimony presented dealt with the appropriate floating rate, a hearing on the appropriate fixed interest rate shall be held as provided below.

WHEREFORE, IT IS ORDERED that a hearing on the appropriate fixed, market rate of interest for Claims within Class 2.3 shall be fixed by mutual agreement of counsel for the Debtor and counsel for the County Tax Collectors for a date preceding the effective date of the Plan. A judgment and order upon the foregoing findings and conclusions shall be issued following such hearing.

DONE and ORDERED.

---

13. *See, e.g., In re Jordan*, 130 B.R. at 191 (prime rate with no adjustments for chapter 13 secured claims); *In re Hudock*, 124 B.R. at 534 (prime rate reflects prevailing market rates); *In re*

*Camino Real*, 818 F.2d at 1507–08 (court approved a 2 percent increase to treasury bill for risk, and a one percent reduction because claim was secured).