In re Ira CASSELL and Shirley Cassell, Debtors.

DOMINION BANK, Appellant,

v.

Ira CASSELL, et al., Appellees.

Civ. A. No. 90-0044-A.
Bankruptcy No. 7-88-01881.

United States District Court,
W.D. Virginia,
Abingdon Division.

Sept. 19, 1990.

James E. Green, Bristol, Va., for appellant.

John M. Lamie, Abingdon, Va., Jo S. Widener, Bristol, Va., for debtors/appellees.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

This case is an appeal from final orders of the United States Bankruptcy Court for the Western District of Virginia. The appealed orders confirm a Chapter 13 plan of the debtor and dispose of objections to that plan. The court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a).

## FACTUAL AND PROCEDURAL BACKGROUND

On November 22, 1988, Ira and Shirley Cassell ("debtors") filed a petition for relief under Chapter 13 of the Bankruptcy Code ("Code"). Dominion Bank, N.A. ("bank"), which held a security interest in a truck the debtors owned, filed a claim against the debtors in the bankruptcy proceeding. Based on the value of the truck at the time of bankruptcy, the bankruptcy court determined that the amount of the bank's allowed secured claim was $6,400.00

The debtors proposed a plan under which the debtors would pay the bank the amount of the bank's claim over a period of thirty-six months with interest thereon at a rate of 11.5%. The bank objected to the interest rate. It pointed out that the rate was below the prevailing market rate for similar loans, which it contended was the proper measure for determining the interest rate on allowed secured claims.

Hearings on the issue were held on June 20 and October 10, 1989. On November 29, 1989, the bankruptcy court entered a memorandum opinion and order ("Interest Rate Order") that rejected the bank's contention by adopting a formula for calculating interest based on "the Treasury bills rate quoted in the Wall Street Journal." 107 B.R. 536. Using this formula, the bankruptcy court adjusted downward the interest rate in the debtor's plan to 8.57% and entered a final order confirming the modified plan.

The bank appeals from the interest rate order and the order confirming the plan on the issue of the interest rate.

## ANALYSIS

When a creditor holding an allowed secured claim does not accept a debtor's Chapter 13 plan, the present value of the future payments the creditor is to receive must equal the value of the allowed secured claim. § 1325(a)(5)(B)(ii).[1] The critical factor in determining the present value of the future payments is the interest rate used in discounting the future payments. The Code contains no explicit guidance on what rate should be used.

Debtors who resort to Chapter 13 understandably want a low interest rate on allowed secured claims. Creditors want something higher. As the bankruptcy court pointed out, there is "a wilderness of rules courts have waded through to determine the proper interest rate in prior cases." Interest Rate Order at 2. The court is aware of the divergent approaches that other courts have taken in this area. The court also appreciates the desire of the bankruptcy court to define a formula that would simplify and hasten the process of determining the interest rate on each allowed secured claim that comes before the court below. However, the court finds that it must reject the formula the court below adopted in its Interest Rate Order.

---

1. Each citation to a code section (§ ___) refers to a section in Title 11 of the United States Code.

## I. COST OF FUNDS RATE

The bankruptcy court based its formula on a passage from 5 *Collier on Bankruptcy* ¶ 1325.06[4][b][iii][B] (15th Ed.1989) (hereafter, *Collier*). *Collier* asserts that the use of the market rate would usually overcompensate the creditor, which should be compensated only for the estimated replacement cost of the funds which would otherwise be available had the creditor been allowed to possess and sell the collateral securing its loan. However, *Collier* bases its assertion on an erroneous definition of a creditor's cost of funds and justifies its use on unsubstantiated assumptions.

*Collier* assumes that the proper measure of a creditor's cost of funds is its incremental borrowing cost. This assumption contains a basic error. J. Weston & E. Brigham, *Essentials of Managerial Finance* 411 (5th Ed.1979). What *Collier* terms "cost of funds" is better known in financial analysis as the cost of capital. *Id.* at ch. 16. The term "cost of capital" is used to reflect the fact that firms finance their activities through equity as well as debt. Few, if any, firms, and certainly no bank, has all of their capital supplied by debt.[2] Whether a firm is to meet its marginal funding needs through equity or through debt, its cost of capital for those needs is more properly reflected by its weighted average cost of capital rather than its marginal cost of capital. *Id.* at 411.[3]

A weighted average cost of a creditor's capital would be difficult to determine and would vary from creditor to creditor.[4] The

courts are not very well equipped to make such determinations. *In re Hardzog (Hardzog v. Federal Land Bank of Wichita)*, 901 F.2d 858, 860 (10th Cir.1990) (courts are not well situated to use the "cost of funds" approach, which is "not susceptible of accurate determination without complex problems of proof"). However, even if it could be calculated with reasonable accuracy, the cost of capital theory could lead to illogical results. This is because a creditor that is itself a poor risk has a high cost of capital; accordingly, such a creditor theoretically would receive a higher interest rate on an allowed secured claim than would a creditor that has a lower cost of capital. *See In re Snider Farms, Inc.*, 83 B.R. 977, 994 (Bkrtcy.N.D. Ind.1988).

## II. DIFFERENCES BETWEEN MARKET RATE AND ADJUSTED COST OF FUNDS RATE

According to *Collier*, there are two reasons why the market rate exceeds the cost of funds even after the cost of funds has been adjusted for the risk of default. First, because of market inefficiencies, consumers fail to locate and secure the lowest rates available. Second, the market rate contains the "profit" on the loan. (*Collier* asserts that profit should not be taken into consideration in determining the proper discount rate.)

### A. *Market Inefficiencies*

The assertion that there are market inefficiencies is of course true, since no market

---

**2.** Banks are heavily regulated and are required to maintain a certain level of equity capital.

**3.** This is illustrated by the following example: Suppose a firm is deciding whether to engage in projects with an expected yield of 9%. It would finance the project with debt that has a cost of 8%. However, its cost of equity is 12%. The projects would use up the debt capacity of the firm, after which any future projects would have to be financed with equity until a debt/equity ratio is reestablished that is reasonable for the firm. Thus, if the projects are accepted, a future project yielding 11% would have to be rejected because it is below the cost of equity. This problem is avoided if all projects are evaluated based on the weighted average cost of capital rather than on the marginal cost of capital. J. Weston & E. Brigham,

*supra*, 411–12. Applying this reasoning in the Chapter 13 context, it is easy to see the fallacy of the assertion that the true measure of a creditor's cost of funds is its incremental borrowing cost. If one supposes that all of a creditor's assets are claims in Chapter 13, and, further, if one makes the reasonable assumption that the creditor's cost of equity is higher than its cost of debt, then if the creditor is paid an interest rate equal to its incremental borrowing cost, its revenue would be less than its total cost of capital and it would therefore suffer a loss in its value.

**4.** A bank's cost of capital would be very difficult to calculate given the availability of federally insured deposits and regulations concerning minimum equity capital requirements.

is perfectly efficient. However, it would be an extremely complicated task to quantify the inefficiency of the relevant credit market (i.e., Southwest Virginia). No evidence has been offered on this point, and the court feels that simply stating the proposition of inefficient markets is not enough to justify using the proposition to support a cost of funds formula. Accordingly, the court declines to use the proposition as a factor in its decision.

### B. *Profit*

The market rate does include "profit" on the loan. Otherwise, no creditor would willingly make such a loan. The court feels that the profit component of the market rate is properly considered part of the cost of capital. Equity capital is usually obtained in only two ways, either by retaining earnings or by selling equity instruments. In the case of issuance of common stock by the creditor, purchasers of the stock will usually pay an amount equal to the present value of the estimated future dividends, which will be paid out of the creditor's retained earnings. Thus, the use of equity capital usually requires that the creditor have earnings (i.e., profits).

### C. *Differences Between a New Loan and a Claim in Chapter 13*

*Collier* also asserts that there are important differences between the costs incurred by a creditor associated with making a new loan and having a claim in Chapter 13. Specifically, *Collier* asserts that a creditor experiences lower transaction costs and a different, presumably lower, risk of default with a secured Chapter 13 claim than with a similar new loan.

Regarding transaction costs, *Collier* asserts that a creditor would incur higher transaction and administrative costs in regard to a new loan than it would incur in regard to a similar loan that is a claim in a Chapter 13 bankruptcy setting. For this assertion *Collier* cites *In re Fisher*, 29 B.R. 542 (Bkrtcy.D.Kan.1983). However, a creditor almost certainly incurs legal, managerial, and clerical costs in monitoring and accounting for a Chapter 13 claim that are not present in a standard loan situation. Rather than being less, it appears to the court that there is a good chance that the creditor's transaction costs increase for bankruptcy claims. Wherever the truth may lie, whether the costs incurred by the creditor as a result of Chapter 13 are less than the costs that would be incurred in regard to a new loan is a complicated empirical question upon which no evidence has been offered and upon which no evidence was noted in *Fisher*. Given this lack of evidence, the court concludes that assuming the bank's transaction costs are less is not justified.

Regarding default, *Collier* asserts that the risk of default to the creditor of a Chapter 13 secured claim is less than that of a loan identical to the claim. The reasons given are that the court has determined that the Chapter 13 plan is feasible, the creditor retains the lien, and the creditor has the right to seek adequate protection at any time.

The fact that the bankruptcy court has determined that a Chapter 13 plan is feasible means merely that it has determined that it is likely the debtor will make all the required payments. Each Chapter 13 creditor presumably made the same determination (which proved erroneous) when it originally made its loan to the Chapter 13 debtor. Just as in the case of the creditor, the bankruptcy court is based on predictions of future events that may not come true.

Because the debtors have resorted to Chapter 13, the bank, being undersecured, now has a secured loan equal to the value of the collateral and an unsecured loan for the amount in excess of the collateral's value. A bank rarely voluntarily makes a secured loan for the full amount of the collateral's value, for such a loan would lack an "equity cushion." *Snider Farms*, 83 B.R. at 998. Thus, the mere fact that the creditor retains the lien in the collateral certainly does nothing to lessen the amount of risk the bank bears. Indeed, since the loan is for 100 percent of the collateral's value, one might say the bank's risk is greater than before.

Finally, the right to adequate protection is not always vindicated. Enforcing the

right often requires the creditor to expend substantial time and funds in vigilantly monitoring the claim and the collateral so that it may take timely action to protect itself. There is no guarantee that the creditor will receive adequate protection even if it seeks such protection in a timely manner and the bankruptcy court takes timely action. In fact, before the debtors filed this action, the bank had a right of self-help under the Virginia Uniform Commercial Code, Va.Code Ann. § 8.9–503 (1965), whereby they could have repossessed the debtors' vehicle. Now, this right is lost to the bank, as is the right to pursue the collateral by legal action. *Id.* In the face of all these factors, it is difficult to see that the bank endures a lower risk of default.

As was the case regarding transaction costs, the issue of whether or not the risk of default is lessened is an empirical question upon which no evidence has been offered. The court concludes that the reasons given do not justify even assuming that the risk is usually lower. *See Snider Farms*, 83 B.R. at 998–99 (reasons do not justify assumption for Chapter 12 debtor); *contra In re Fowler*, 903 F.2d 694, 697 (9th Cir.1990) (citing *In re Shannon*, 100 B.R. 913, 939 (Bkrtcy.S.D.Ohio 1989)) (Chapter 12).

### III. THE PROPER DISCOUNT RATE—THE MARKET RATE

■ Cases on this issue go both ways, but the court prefers the analysis and reasoning found in the authority that favors the market rate as the proper discount rate for Chapter 13 secured claims. The Sixth Circuit has stated that, in the absence of special circumstances, the discount rate to be used is "the current market rate of interest used for similar loans in the region." *Memphis Bank & Trust v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982). *Memphis Bank* is the only circuit court opinion which has directly addressed the issue. A similar preference for something akin to the market rate is found in *In re Smith*, 42 B.R. 198, 201 (Bkrtcy.N.D.Ga. 1984) (quoting *In the Matter of Cooper*, 11 B.R. 391 (Bkrtcy.N.D.Ga.1981)):

The best method to ascertain the value of money to a creditor paid over a period of time is to determine what that particular creditor routinely receives as negotiated finance charges over the period of time with similar collateral.

The court also finds support for the market rate in cases construing other sections of the Code. The present value requirement of § 1325(a)(5)(B)(ii) is identical to the present value requirements of §§ 1225(a)(5)(B)(ii), 1129(a)(9)(B)(ii), and 1129(b)(2)(A)(i)(II). Thus, interpretations of those provisions are equally applicable to determining present value under § 1325(a)(5)(B)(ii). *Collier*, ¶ 1225.03[c]; *see also United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1288–89 (8th Cir.1986); *In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 652 n. 6 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

In *In re Architectural Design, Inc.*, 59 B.R. 1019, 1021 (W.D.Va.1986) (Williams, J.), this court, citing *Memphis Bank*, determined that the present value requirement of § 1129(a)(9)(B)(ii) was to be calculated using the market rate approach. The Tenth Circuit, interpreting the present value requirement of § 1225(a)(5)(B)(ii), concluded that the discount rate to be used should be "the current market rate of interest for similar loans in the region." *Hardzog*, 901 F.2d at 860.

The Ninth Circuit, interpreting the present value requirement of § 1225(a)(5), concluded that the discount rate to be used should be "the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." *Fowler*, 903 F.2d at 697 (quoting *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1504 (9th Cir.1987)). The court in *Fowler* noted that two other circuits have adopted the same interpretation of § 1225(a)(5). *Id.* (citing *United States v. Arnold*, 878 F.2d 925, 930 (6th Cir.1989) and *United States v. Doud*, 869 F.2d 1144, 1145–46 (8th Cir. 1989)).

Based on the reasoning in *Memphis Bank* and *Fowler*, the court concludes that the market rate of interest is the proper figure for discounting the future payments a debtor must make to a creditor holding a Chapter 13 secured claim.

## IV. METHOD FOR DETERMINING THE DISCOUNT RATE

The method for determining the prevailing market rate for loans similar to that of the Chapter 13 claim would normally be determined by testimony. However, the court notes the bankruptcy court's valid concern for streamlining the confirmation process by allowing the use of a formula by which a debtor could calculate the proper discount rate to use in determining the amounts to be paid under the proposed plan. Many secured claims in Chapter 13 involve small amounts; requiring testimony and other evidence to prove the proper discount rate for each claim imposes a wasteful and unnecessary burden on the debtor, the creditors, and the bankruptcy court itself.

■ The court concludes that the use of a predetermined formula that results in a figure approximating the market rate is appropriate if it is used merely as a rebuttable presumption of the market rate. *Fowler*, 903 F.2d at 698. Any formula used by the bankruptcy court initially should be determined by testimony. This testimony should show that use of the formula approximates the prevailing market rate for the type of loan in the case before the bankruptcy court; further, the testimony should show that use of the formula would reasonably approximate the prevailing market rate for loans in future cases for which the formula is intended to be used. The prevailing market rate for similar loans, while the result of complex economic forces, is easily proven by expert testimony and other evidence.

The court in *Doud*, while endorsing the market rate approach, approved a method of determining that rate by taking the risk free rate, that of a treasury bond with the same maturity date as the loan in question, and then adding a risk factor of two per-

cent. *Doud*, 869 F.2d at 1145. *Fowler*, while not outright rejecting this approach, remanded its case to the district court because that court had failed to justify its calculation of the risk factor that it used. *Fowler*, 903 F.2d at 698–99. Because the risk factor is determined without reference to prevailing market rates, the use of this method has the same pitfalls as the "cost of funds" approach. Moreover, it is questionable whether a court can ever adequately justify its determination of the risk factor. *See Hardzog*, 901 F.2d at 860. Therefore, this court follows the court in *Hardzog* and rejects the method advanced by *Doud* and concludes that any formula used initially must be determined by reference to the prevailing market rates.

The court will not attempt to set forth in advance what it believes is an appropriate formula or formulae. That is properly part of the bankruptcy court's factfinding role. However, it appears that any formula would probably contain a base rate, possibly a prime rate or a treasury bill or bond rate, that would move in tandem with the market rate. The bankruptcy court, in initially determining the formula, would then add a factor to the base rate so that the sum of the two amounts equals the market rate as determined by testimony and other competent evidence. The bankruptcy court should have great leeway in establishing any number of formulae as long as each one is initially determined through competent evidence and the rates resulting from their use appear reasonably to approximate the corresponding market rates.

As noted, the use of a formula would establish only a rebuttable presumption. The parties should always be allowed to introduce evidence showing that the formula relied upon does not reflect the prevailing market rate, *Fowler*, 903 F.2d at 698, or that the rate resulting from the formula should be adjusted to take into account certain factors unique to the claim.

## V. BANKRUPTCY COURT'S UNILATERAL MODIFICATION OF THE PLAN

■ Although the parties here did not specifically raise the issue, the court notes

 

a serious procedural error made during the proceedings in the court below. The Code provides that only the debtor shall file a plan under Chapter 13. § 1321. Only the debtor may modify a plan prior to confirmation. § 1323. And a diligent search reveals no authority in a bankruptcy court to modify a plan when the plan comes before the court for confirmation. *See* § 1325. Thus, neither the bankruptcy court nor the trustee has the authority unilaterally to file or modify a plan. *In re Capodanno*, 94 B.R. 62, 68 (Bkrtcy.E.D.Pa. 1988).

The debtors here filed a plan that proposed an interest rate of 11.5% for the bank's claim. The bank objected, arguing that the proposed rate was too low. After two hearings on the interest rate issue, the bankruptcy court took the matter under advisement. It then issued the Interest Rate Order, which required the trustee to tender to it a confirmation order containing an interest rate calculated in accordance with the Interest Rate Order. The trustee complied, and the bankruptcy court entered the trustee's order, which contained an interest rate of 8.57% for the bank's claim. Thus, the bankruptcy court unilaterally modified the plan by changing the interest rate contained in the debtors' original plan.

Neither the bankruptcy court nor the trustee had any authority to modify the plan before its confirmation. The role of the bankruptcy court is to determine whether a debtor's proposed plan should be confirmed. If it determines that a plan should not be confirmed, it should state its reasons for that determination. However, the bankruptcy court may not unilaterally modify a debtor's plan, even if it reasonably assumes that a debtor would approve the modification.

## CONCLUSION

Because the court rejects the legal conclusions supporting the interest rate formula found in the bankruptcy court's Interest Rate Order, the court reverses the Interest Rate Order and the Order confirming the plan and remands the case for further proceedings consistent with this Memorandum Opinion.