In re David G. **IVEY** and Amelia D. Ivey, Debtors.

**FLEET FINANCE, INC.**, Appellant,

v.

David G. **IVEY** and Amelia D. Ivey, Debtors and Kathryn L. Bringle, Trustee, Appellees.

Nos. B–90–11243C–13 W, 2:91CV00564.

United States District Court
M.D. North Carolina
Greensboro Division.

Sept. 24, 1992.

Walter W. Pitt, Jr., D. Anderson Carmen, Bell, Davis & Pitt, P.A., Winston–Salem, N.C., for Fleet Finance, Inc.

Stephen D. Ling, Ling & Farran, Greensboro, N.C., Kathryn L. Bringle, Winston–Salem, N.C., Rayford K. Adams, III, Tuggle Duggins & Meschan, P.A., Greensboro, N.C., for David Gerald Ivey and Amelia Dawn Ivey.

Rayford K. Adams, III, Margaret V. Costley, Tuggle Duggins & Meschan, P.A., Greensboro, N.C., for Kathryn L. Bringle.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Fleet Finance Company appeals from a final order of the United States Bankruptcy Court denying its objection to a discount rate of 13% on payment of its allowed secured claim of $5,474.16. 131 B.R. 43. The issue presented is whether this plan complies with the "present value" requirement of 11 U.S.C. § 1325(a)(5)(B) (West Supp.1992). Although this court would not adopt as its own the method used by the Bankruptcy Court to calculate the discount rate, the plan does conform with the requirements of § 1325(a)(5)(B) and, hence, this court will AFFIRM the Bankruptcy Court's order.

## I. FACTS AND PROCEDURAL HISTORY

On or about July 10, 1989, David G. Ivey and Amelia D. Ivey ("Debtors") borrowed $6,096.09 from Fleet Finance, Inc. ("Fleet Finance"). The loan was for 36 months and the annual interest rate was 21.09% per annum. To secure the obligation, Debtors executed a security agreement which granted Fleet Finance a security interest in Amelia Ivey's 1986 Chevrolet Truck. Fleet Finance perfected this security interest.

On May 2, 1990, the Iveys filed a Chapter 13 bankruptcy petition, at which time the payoff balance on the loan was $5,474.16. The value of the truck was greater than $5,474.16, thus Fleet Finance is a wholly secured creditor. The plan confirmed by the Bankruptcy Court requires the Iveys to pay back the $5,474.16 over five years at 13% interest. In determining this 13% interest rate, the Bankruptcy Court chose to "limit its discussion of market rates of interest on loans secured by motor vehicles to the rates of interest charged on such loans by banks, savings and loan associations, credit unions, and captive finance companies." (R–33 at 15–16.) The Bankruptcy Court did not consider the interest rates charged by consumer finance agencies because it decided that such interest rates "were not relevant to any discussion of a market rate of interest." (R–33 at 15.) Fleet Finance objected to the proposed 13% per annum interest rate and the exclusion of interest rates charged by consumer finance agencies. This objection was denied. Fleet Finance now appeals to this court.

## II. STANDARD OF REVIEW

 As a preliminary matter, this court must determine the proper standard of review. In general, the Bankruptcy Court's findings of fact are reviewed under a clearly erroneous standard, and its conclusions of law are reviewed *de novo*. Fed. R.Bankr.P. 8013; *In re Bryson Properties, XVIII*, 961 F.2d 496, 499 (4th Cir.1992). While the question of an appropriate discount rate under § 1325(a)(5)(B) may be considered a mixed question of law and fact, this court believes its precise task is to review *de novo* the general methodology used by the Bankruptcy Court to determine the discount rate, and to review the Bankruptcy Court's computation of a proper interest rate under a clearly erroneous standard. *See United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir.1989) ("If the bankruptcy court has correctly considered all of the elements involved in computing a discount rate, determination of the proper discount rate in a particular case is a factual inquiry.").

## III. DISCUSSION

### A. Section 1325 and Some Economic Concepts

Section 1325[1] of the Bankruptcy Code sets out the requirements for confirmation of a debtor's Chapter 13 Plan. If a secured creditor does not accept a debtor's Chapter 13 Plan, the Bankruptcy Court can confirm a plan for deferred payments only if the "present value" of the future payments equals the value of the allowed secured claim. Section 1325(a)(5)(B)(ii).

 The concept of present value is, in theory, quite simple. " '[P]resent value' is a term of art for an almost self-evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month, or a year hence." 5 *Collier on Bankruptcy*, ¶ 1129.02, at 1129–82 (15th ed. 1990); *In re Computer Optics, Inc.* 126 B.R. 664, 671 (Bankr.D.N.H.1991). The purpose of present value analysis is to compensate for the time value of money. Present value analysis takes into account several factors, including magnitude and timing of future payments. In addition, the crucial element in a present value calculation is determination of the proper discount rate, which is interest[2] paid to the creditor. *See* C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev. 42, 44–45 (1987).

### B. The Problem

Unfortunately, the Bankruptcy Code gives no explicit method for determining present value since it provides no explicit method for determining the proper interest rate. The reality is that Congress likely did not consider the matter much beyond the general concepts of present value and

---

1. Section 1325 provides in full that:
 (a) The court shall confirm a plan if—
 (1) the plan complies with the provisions of this chapter and other applicable provisions of this title;
 (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
 (3) the plan has been proposed in good faith and not any means forbidden by law;
 (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
 (5) with respect to each allowed secured claim provided for by the plan—
 (A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
 (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
 (C) the debtor surrenders the property securing such claim to the such holder; and
 (6) the debtor will be able to make all payments under the plan and to comply with the plan.

2. As a matter of economic theory, there are three components to an "interest rate": inflationary expectations, a "real" interest component, and a risk premium. The "riskless rate of interest" refers to the first two components, while the risk premium refers to the amount necessary to compensate a lender for the risks of loss associated with loaning the money.

time value of money.[3]

The parties agree that courts should look to the "market" to determine a proper interest rate. Market rates of interest are the best indicators of present value of deferred payments because they are products of supply and demand and reflect the interaction of economic variables that affect the cost of lending money. *In re Benford,* 14 B.R. 157, 160 (Bankr.W.D.Ky.1981).

The problem, of course, is that there are many potential market rates of interest depending on how you define the relevant loan market—so determining the "correct" discount rate is open to debate. Predictably, in the bankruptcy context, creditors want the market defined in such a way that evidence of high market rates is available. Debtors, of course, offer evidence of low market rates defining the relevant market accordingly.

Courts grappling with the issue have been unable to agree on a uniform approach.[4] The case law with regard to an appropriate discount rate has created numerous, conflicting, "and sometimes indecipherable formulas as the courts have tried to implement the fact specific market analysis approach." *In re Computer Optics,* 126 B.R. at 671. See also, Carbiener, *supra,* at 46–57. Indeed a review of the case law reveals numerous methods of calculating a discount rate including: (1) the current market rate for similar loans (the coerced loan theory),[5] (2) the rate the creditor must pay to replace funds (cost of funds theory),[6] (3) the "riskless" rate with an upward adjustment,[7] (4) the contract price,[8] (5) the IRS judgment rate set by 26 U.S.C. § 6621,[9] (6) statutory judgment rate,[10] and (7) the Treasury Bill rate.[11][12]

Hence, this court now faces the difficult task of determining whether the Bankruptcy Court's method of calculating the discount rate is an appropriate alternative solution.

---

3. For example, the legislative history of similar provision 1129(b)(2)(A)(i)(II) simply states that the statute "contemplates a present value analysis that will discount value to be received in the future...." *In re Computer Optics,* 126 B.R. 664, 671 (Bankr.D.N.H.1991) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 414–415 (1977), U.S. Cong & Admin. News 1978, at 5787, 6370). There is no suggestion in the legislative history of a specific methodology.

4. The present value issue arises under several Bankruptcy Code sections including § 1129 and § 1225. The analysis used under one section is generally considered to be applicable to the others. At least one court, however, has noted a difference between reorganizations under Chapters 11 and 13. *In re Loveridge Machine & Tool Co.,* 36 B.R. 159, 168 (Bankr.D.Utah 1983).

5. *For example, United States v. Arnold,* 878 F.2d 925 (6th Cir.1989); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982); *In re Hardzog,* 901 F.2d 858 (10th Cir.1990); *In re Mellema,* 124 B.R. 103 (Bankr.D.Colo.1991).

6. *For example, In re Jordan,* 130 B.R. 185 (Bankr.D.N.J.1991); *In re Campbell,* 16 B.R. 496 (Bankr.N.D.Ill.1982).

7. *For example, United States v. Doud,* 869 F.2d 1144 (8th Cir.1989); *In re Computer Optics,* 126 B.R. 664.

8. *For example, In re Smith,* 4 B.R. 12 (Bankr. E.D.N.Y.1980); *In re Cooper,* 11 B.R. 391 (Bankr.N.D.Ga.1981).

9. *For example, In re Crotty,* 11 B.R. 507 (Bankr. N.D.Tex.1981); *In re Strong,* 12 B.R. 221 (Bankr. W.D.Tenn.1981).

10. *For example, In re Marx,* 11 B.R. 819 (Bankr. S.D.Ohio 1981).

11. *For example, In re Mitchell,* 39 B.R. 696 (Bankr.D.Or.1984).

12. In addition, as if this myriad of approaches were not enough, further confusion is created by courts' inconsistent use of language in labelling the various approaches. For example, as an historical matter it seems that initially the two competing schools of thought were labelled as a "cost of funds approach" and a "market approach". See, for example, *In re Cassell,* 119 B.R. 89, 90–91 (W.D.Va.1990). Recent caselaw suggests that the majority of courts have abandoned the "cost of funds" approach and agreed on a "market rate" approach, *In re Mellema,* 124 B.R. at 105, and indeed the parties agree that a market rate approach is appropriate. However, this so-called agreement on a "market rate" approach begs the question, proving no more than the parties agree that the secured creditor should get the time value of its money. Nearly all of the methods listed above can be considered a method of calculating market value. Even the supposedly unique "cost of funds" approach is simply another method of determining the time value of a creditor's money.

## C. The Bankruptcy Court's Opinion: The "Coerced Loan" Approach

■ The Bankruptcy Court and both parties to this case appear to agree that the proper method is the so-called "coerced loan" approach. Under this approach, the creditor is perceived as being coerced into giving a loan to the debtor and should be compensated at "the current market rate of interest used for similar loans in the region." *In re Hardzog*, 901 F.2d at 860 (10th Cir.1990).

■ Assuming this methodology, the issue before the court, as Judge Tart stated, is a matter of definition: How should the court define "similar loans in the area"? (R–33 at 3.) The parties agree that "similar loans" must mean motor vehicle loans, but they disagree as to what type of creditor is "similar" enough. The Bankruptcy Court chose to "limit its discussion of market rates of interest on loans secured by motor vehicles to the rates of interest charged on such loans by banks, savings and loan associations, credit unions, and captive finance agencies." (R–33 at 15–16.) The Bankruptcy Court did not consider the interest rates charged by consumer finance agencies. Fleet Finance argues that by excluding evidence of interest rates charged by consumer finance institutions, the Bankruptcy Court has confirmed a plan where the interest rate on the "coerced" loan is not equal to "the current market rate of interest for similar loans." Creditor Fleet Finance contends that the market reflects three tiers of lenders—(1) banks, credit unions; (2) captive finance companies; and (3) consumer finance agencies—and that the "similar" loan is that by a consumer finance agency.

*If* the coerced loan method were, in fact, the only correct method, this court would agree with Fleet Finance. If we take seriously the "similar loan" requirement, the interest rate decided on by the Bankruptcy Court is not a similar loan made by a similar creditor to a similar debtor. That is, consumer finance groups are part of the relevant market for calculating a similar loan.

The Bankruptcy Court did not consider the interest rates charged by consumer finance agencies on the theory that since consumer finance groups have maximum rates set by N.C.Gen.Stat. § 53–176, they are not subject to market forces. Trustee and Debtor contend that the fact that consumer finance agencies nearly always charge the maximum statutory rate, is proof that they are not subject to market forces.

On balance, this court finds that the existence of statutory maximums does not remove consumer finance agencies from the marketplace. These consumer finance companies are businesses, and basic supply and demand economics suggests that they would lower interest rates if it were necessary to stay in business. Far from artificially keeping interest rates high, the statutory maximums likely keep interest rates artificially low. That is, the "natural" market rate, absent N.C.Gen.Stat. § 53–176 must be at least 21% interest, for if the natural rate were lower, statutory maximums would not affect the rate. This rationale is bolstered by the purpose of § 53–176 which presumably was to prevent potential creditors from charging unfairly high interest rates that the free market made possible.

Thus, in short, *if* the proper method is the coerced loan method, this court holds that it is error not to include consumer financing businesses in the calculation of the market discount rate.

## D. Problems with The Coerced Loan Theory

■ This court is not convinced that the coerced loan method is in fact the proper method for determining the discount rate. First, it is important to emphasize that the express language of § 1325 does not require a coerced loan approach. On its face, the statute leaves open several possibilities for determining the proper discount rate. Congress may have intended a case-by-case creditor specific approach, or it may have intended a discount rate to take into account the time value of money in our economy as a general proposition without any

fact specific analysis of an individual creditor or debtor. *In re Computer Optics, Inc.*, 126 B.R. at 671. In any case, it is at least arguable that a general approach is more appropriate.

Secondly, a fundamental problem exists with the whole coerced loan theory. In reality, there is no market for "similar loans to a similar debtor" because there is no market for loans to a Chapter 13 debtor. Courts have been willing to overlook this problem, suggesting that the purpose of the coerced loan theory is to approximate a "similar" market. Unfortunately, there is no logical way to determine what is, in fact, "similar." At the extreme, if the "similar" requirement were taken literally, creditors can insist that no interest rate could provide adequate compensation, and debtors can argue that setting the interest rate based on a hypothetical rate of interest that would be given to a financially distressed debtor, would be unreasonably high. *See* Waltraud S. Scott, Comment, *Deferred Cash Payments to Secured Creditors in Cramdown of Chapter 11 Plans: A Matter of Interest*, 63 Wash. L.Rev. 1041, 1056 (1988). Between these extremes, courts have applied this approach with various degrees of emphasis. Some focus on the characteristics of the deferred payments, others focus on debtor's characteristics, while others focus on the creditor. *Id.* at 1050–51, n. 54. All of this suggests there is no logical way, based on market theory, to determine where the point of emphasis should be. Thus, the coerced loan approach is indeed fundamentally flawed through vagueness.

Furthermore, the origination of the coerced loan theory rests on tenuous grounds. This theory originated not in case law, but in the bankruptcy treatise, Collier on Bankruptcy. The editors write that:

It is submitted that a deferred payment is an obligation under a plan is like a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore sub-mitted that the appropriate discount rate must be determined by reference to the "market" rate of interest.

5 *Collier on Bankruptcy*, ¶ 1129.03, at 1129–83. As one court noted, "without citing any case or other authority that existed at the time, the Collier treatise in that comment took a quantum leap from the present value concept (in terms of the time value of money) into a totally different concept of a loan transaction involving fact specific risk analysis" *In re Computer Optics*, 126 B.R. at 671. This court agrees that much of the confusion surrounding the interest rate issue stems from Collier's reference to a "coerced loan" which has "skewed the analysis ever since."

Ironically, the Collier treatise itself strongly criticizes the coerced loan approach. While Collier does suggest a coerced loan approach in its discussion of § 1129, Collier criticizes this coerced loan approach in its discussion of § 1325 (the section of the Bankruptcy Code relevant to this case), and argues that the so-called cost of funds approach is more accurate. The editors write that:

The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position economically as if the debtor had exercised the option of surrendering the collateral. Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim, which would be received in full immediately upon confirmation if the collateral was liquidated. Since the creditor is deprived of these funds to the extent they are deferred through the plan, the creditor must obtain them elsewhere, for whatever purposes they are to be used. In view of this purpose, the appropriate discount is one which approximates the creditor's cost of funds in its business borrowings....

... Treating a chapter 13 deferral of payments like a new loan transaction ... provides the holder of the allowed secured claim with not only the cost of the funds it would lend but also the costs of

a new loan transaction, which would not be incurred, and a profit that would be earned in that transaction. Neither of these latter two amounts would be received if the collateral were surrendered.... To include them in the present value discount rate would give the holder of an allowed secured claim more than the equivalent of immediate payment of that claim in full.

*Id.*, ¶ 1325.06, at 1325–41.

This passage from the Collier treatise is significant for several reasons. First, it calls into question the underlying authority for the whole coerced loan theory. More substantively, it points out that a market based coerced loan approach implicitly includes a profit margin, for the rate of interest on money in a given market includes a profit margin for the creditors in that market. This is contrary to a basic tenant of bankruptcy law that the creditor's property, but not his profit,[13] will be protected. *See, e.g., In re Mitchell*, 39 B.R. 696, 702 (Bankr.D.Ore.1984); *In re Wilkinson*, 33 B.R. 933, 936 (Bankr. S.D.N.Y.1983); *but cf. In re Cassell*, 119 B.R. 89, 92 (Bankr.W.D. Va.1990). Furthermore, the coerced loan approach implicitly includes costs of a loan transaction that are non-existent in the bankruptcy context.[14]

Additionally, the coerced loan approach can effectively make the original contract price between creditor and debtor the discount rate. This case illustrates the point

well for if Fleet's version of the coerced loan approach were accepted, it would result in a discount rate of 21.09%, which is *de facto* the contract price. This runs afoul of the only clear legislative history on the topic in which Congress explicitly rejected using the contract rate as the discount rate.[15]

For all these reasons this court finds the coerced loan approach to be seriously flawed.

**E. Other Approaches and their Problems**

■ Several other methods tried by courts can be quickly dismissed as inadequate. As just discussed, Congress has made it clear that the contract rate is inappropriate by rejecting a proposed amendment to § 1325 which explicitly provided for a contract rate.[16] *See* footnote 15. Furthermore, the statutory judgment rate is not sufficiently market responsive since it is typically rarely adjusted. Also, the Section 6621 rate is not market responsive since it is calculated based upon part prime rates. *See* Carbiener, *supra*, at 59.

The serious alternatives to a "coerced loan" theory are the "cost of funds" and "riskless rate plus upward adjustment" approaches.

**1. Cost of Funds Approach**

■ This approach focuses on the creditor's cost of borrowing rather than the debtor's cost of obtaining a similar loan.

---

**13.** This is not to say that a creditor is prohibited from making a profit on its original contract or in its business dealings. This profit is in fact protected by bankruptcy law in the calculation of the allowed claim. That is, it is important to note that Fleet's anticipated profit on the original contract with the Iveys is protected. The allowed claim in the amount of $5,474.16 includes Fleet's anticipated profit on the original contract because the allowed claim is based on the amount of the original contract.

**14.** Of course, there are costs of bankruptcy that are not included in a market rate of interest. *In re Cassell*, 119 B.R. at 92. This dissonance between the costs associated with a bankruptcy proceeding and a market loan transaction illustrates the inherent limits of market theory in the bankruptcy context. *See* parts E.1. and F.1. below.

**15.** The proposed amendment that Congress rejected provided that:

> [T]he value, as of the date of filing the plan, of property to be distributed under the plan is not less than the value determined under section 506(a) of this title ... if such value is to be paid in installments, *interest is to be paid at the rate specified in the consumer's contract....*

H.R. 4786, 97th Cong., 1st Sess. § 19(2)(A) (1981), *quoted* in *Matter of Richards*, 106 B.R. 762, 765 (Bankr.M.D.Ga.1989).

**16.** There is case law to the effect that the contract rate should be used if it is less than the market rate, but this is not relevant to the present case. *In re Colegrove*, 771 F.2d 119 (6th Cir.1985).

*See, for example, In re Jordan,* 130 B.R. 185 (Bankr.D.N.J.1991); *In re Willis,* 6 B.R. 555 (Bankr.N.D.Ill.1980); *In re Campbell,* 16 B.R. 496 (Bankr.N.D.Ill.1982); 5 *Collier on Bankruptcy,* ¶ 1325.06, at 1325–41. The primary advantage to this approach over the coerced loan approach is that at least a market exists in the real world for loans to the creditor. A second advantage of this approach is that it does not include profit to the creditor. In short, because of these advantages, the interest rate charged to the creditor may be a better approximation of the time value of money than the coerced loan approach.

Unfortunately, there are some basic problems with this approach as well. It is important to keep in mind that the actual transaction we are dealing with is a Chapter 13 deferred payment plan. The problem is that the risks involved with the Chapter 13 Plan and the risks involved in lending money to the creditor, seem to be very tenuously related. While a creditor's good credit rating allows it to borrow at lower rates, it still has to look to the debtor to make the repayments, and the debtor's ability to pay back the money has very little, if anything, to do with the creditor's own personal credit rating. Furthermore, from the debtor's perspective, it seems unprincipled that the debtor's rate of interest on deferred payments should vary depending on the creditworthiness of the creditor. *In re Cassell,* 119 B.R. at 91; *In re Snider Farms, Inc,* 83 B.R. 977, 994 (Bankr. N.D.Ind.1988).

Another practical problem is that, despite the reality of a market for loans to a solvent creditor, courts have been unable to agree on an appropriate method for calculating the cost of funds to a creditor and many of the same questions of emphasis and generality are raised. *See* Carbiener, *supra,* at 54–55.

Hence, this court finds this approach flawed as well.

### 2. *Riskless Rate Plus Upward Adjustment*

 The notion under this theory is to use a riskless rate as a base rate, and add a percentage upward adjustment to cover, in some general sense, the overall risk associated with a Chapter 13 reorganization. *Doud,* 869 F.2d 1144; *In re Computer Optics,* 126 B.R. at 672. More specifically, the approach is to use the yield on a treasury bond of like maturity to the plan and typically add a 1–2% upward adjustment to account for risk of default under the plan.

The court finds this approach to be the most promising. First and foremost, this approach in fact focuses on the actual transaction at hand—the Chapter 13 deferred payment plan. The so-called riskless rate is typically approximated by the Treasury bill rate. All that is left is to compensate the debtor for the risk involved under the Chapter 13 Plan. The problem with this approach is that courts are perhaps ill-equipped to determine what risks to the claim are under the plan. *Hardzog,* 901 F.2d at 860. However, this court believes that this problem is surmountable,[17] as discussed in Part F. 2. below.

### F. Conclusions

#### 1. *Limits of a Market Based Analysis*

As the previous discussion indicates, courts are all over the board in determining the proper method for calculating the proper interest rate. Part of the problem is an almost universal failure of the courts to recognize the limits of a market based approach. At the most basic level, even assuming that courts were capable of perfectly applying market theory, the "correct" discount rate simply does not exist. As we have noted, there are numerous "market" rates of interest which may be used to approximate the appropriate discount rate for a Chapter 13 deferred payment plan.

The reason there are numerous approximate market rates is that, in fact, no mar-

---

**17.** In any case, the problem is no more difficult than determining a market rate. *See In re*

*Mellema,* 124 B.R. 103, 105, n. 6.

ket exists for loans to a Chapter 13 debtor. That is, if we analyze the three components of an interest rate (*see* footnote 2), we must recognize that there is no market rate in the real world which includes a risk premium commensurate with the risk that the debtor will not make the deferred payments under the plan. Thus, using a market based theory to try and determine this risk premium is impossible and simply a waste of time. Scott, *supra*, at 1055–56.

The judicial response, of course, has been to attempt to find a market equivalent transaction, i.e., a transaction that occurs in the marketplace which is equivalent to a deferred payment plan under Chapter 13. As we have seen, however, the debate over the appropriate market equivalent is apparently endless as parties debate over what "similar" means. Most importantly, market theory offers absolutely nothing to the resolution of this debate. Market theory offers no special insight into what market transaction in the real world is sufficiently "equivalent" to a Chapter 13 deferred payment plan and the inherent risks involved.

### 2. *The Judicial Role*

Given these inherent limitations of market theory the obvious question is, how should the court determine a proper discount rate? It seems to this court that the starting point should be to use market theory to the extent possible, that is, to determine the riskless rate of interest based presumably on a treasury bond rate reflecting the terms and payout period of the deferred payment plan.[18] Then the court must determine what risk premium, if any, is an appropriate addition.

■ In making this determination, the court should keep in mind that market analysis cannot provide the answer, and in any case, as one commentator has aptly pointed out, "[t]he real argument between debtor and creditor is not about economic theory and loan markets but about their rights." Scott, *supra*, at 1056. Creditors want to liquidate the debtor or a larger share of the debtor's future income. Debtors believe a high rate of interest would overcompensate a creditor, perhaps harming other creditors or threatening the success of the plan. *Id.*

The point is that in determining the risk premium to be added to the riskless rate of interest, the courts should explicitly focus on the rights of the parties, balancing the interests sought to be furthered by bankruptcy law. After all, this is what the parties care about. Furthermore, courts are more adept at balancing rights than they are at expounding economic theory.[19]

### 3. *The Bankruptcy Court's Opinion*

■ In the present case, a 13% interest rate is certainly in excess of the riskless rate of interest. There is apparently no dispute that the plan has been found to be feasible, and to the extent that any upward adjustment stemming from the Chapter 13 reorganization might be required, 13% is clearly sufficient to cover any necessary upward adjustment. Accordingly, this court finds that the plan meets the present value requirements of § 1325 of the Bankruptcy Code. Thus, the Bankruptcy Court's denial of Fleet's objection to the 13% interest rate is AFFIRMED.

---

**18.** Accurately reflecting the terms and payout period of the deferred payment plan can be somewhat complicated, but is certainly manageable. *See,* Carbiener, *supra,* at 64.

**19.** As an aside, this court notes its agreement with Scott that two issues cry out for judicial attention. First, should the interest rate be uniform or case-specific? (Examples of uniform interest rate are: *In re Fi–Hi Pizza,* 40 B.R. 258, 272 (Bankr.D.Mass.1984); *In re Fisher,* 29 B.R.

542, 552 (Bankr.D.Kan.1983). (Examples of case-specific interest rate are: *In re Fowler,* 903 F.2d 694 (9th Cir.1990); *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1508 (9th Cir.1987); *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1289 (8th Cir.1986). Second, should the interest rates be relatively high or low? Scott, *supra,* at 1057. At the present time, this court declines to pursue these issues further.