**In re David G. IVEY and Amelia D. Ivey, Debtors.**

**Bankruptcy No. B–90–11243 C–13.**

United States Bankruptcy Court, M.D. North Carolina.

Aug. 19, 1991.

Kathryn L. Bringle, Winston–Salem, N.C., Standing Trustee.

Rayford K. Adams, III, Greensboro, N.C., for trustee.

D. Anderson Carmen, Winston–Salem, N.C., for Fleet Finance, Inc.

**44**

## MEMORANDUM OPINION

JERRY G. TART, Bankruptcy Judge.

THIS MATTER came on for an initial hearing on November 8, 1990, upon the objection of Fleet Finance, Inc. to confirmation of the Chapter 13 plan of David G. Ivey and Amelia D. Ivey. D. Anderson Carmen appeared as counsel for Fleet Finance, Inc.; Stephen D. Ling appeared for the Iveys; Kathryn L. Bringle appeared in her capacity as Standing Trustee; and Rayford K. Adams, III appeared for the Standing Trustee. When the parties concluded their arguments on November 8, 1990, the court requested additional information and took the matter under advisement. After reviewing the information supplied by the parties and conducting independent research on the issues raised by Fleet's objection to confirmation, the court set the matter for further hearings on March 28, 1991. At that hearing, Kathryn L. Bringle appeared in her capacity as Standing Trustee; Rayford K. Adams, III appeared for the Standing Trustee; and D. Anderson Carmen appeared for Fleet Finance, Inc. Having considered the evidence presented and the arguments of counsel, and having taken the matter under advisement, the court hereby denies the objection of Fleet Finance, Inc. and finds that the provisions of the Iveys' Chapter 13 plan meet the standards for confirmation as set out in § 1325 of the Bankruptcy Code.

## STATEMENT OF THE ISSUE

The parties have agreed that secured claims in Chapter 13 plans must be paid with interest in order to give the secured creditor the "present value" of its claim. The parties have also agreed that the interest rate paid on secured claims in Chapter 13 plans must reflect market rates of interest charged on similar loans in the area. However, the parties disagree as to what rate of interest the Iveys' plan must pay on Fleet's secured claim in order to accurately reflect market rates of interest charged on similar types of loans in the area.

Fleet argues that the 13% rate of interest used in the Iveys' Chapter 13 plan does not reflect the rates of interest charged by consumer finance companies in North Carolina and therefore does not accurately reflect market rates of interest for similar types of loans in the area. According to Fleet, the correct market rate of interest for claims based on loans made by consumer finance companies is the rate presently charged by consumer finance companies, which happens to be the maximum interest rate allowed pursuant to N.C.Gen.Stat. § 53–176.

The Standing Trustee acknowledges that the 13% rate of interest used in the Iveys' Chapter 13 plan does not reflect the rates of interest charged by consumer finance companies, but she contends that all loans secured by motor vehicles are essentially the same once a Chapter 13 case is filed, and, therefore, the rate of interest paid on claims secured by motor vehicles should be the same for all such creditors: the lesser of the contract rate of interest or 13%. According to the Standing Trustee, the rates of interest presently charged on vehicle loans by banks, savings and loan associations, finance companies that are affiliated with automobile manufacturers ("captive finance companies") and credit unions accurately reflect market rates of interest for similar types of loans in the area.

Thus, it appears to the court that the question presented by this matter is one of definition: how should the court define "similar types of loans in the area" for purposes of determining whether a creditor with a claim secured by a motor vehicle has received interest on its claim at a "market rate" under a Chapter 13 plan? If "similar types of loans in the area" means "loans secured by motor vehicles made by consumer finance companies pursuant to N.C.Gen.Stat. § 53–176", then the 13% rate of interest paid under the Iveys' Chapter 13 plan would appear to be inadequate. If, on the other hand, "similar types of loans in the area" means "consumer loans secured by motor vehicles made in North Carolina", then the question is whether the 13% rate of interest used in the Iveys' Chapter 13 plan reflects market rates of interest for such loans.

This court is of the opinion that "similar types of loans in the area" should be defined as "consumer loans secured by motor vehicles made in North Carolina." This court is also of the opinion that so long as the interest rate paid on secured claims in a Chapter 13 plan falls within the range of interest rates presently charged by banks, credit unions, savings and loan associations and captive finance companies, that rate of interest reflects a market rate of interest. The interest rates charged by such lenders reflect actual economic conditions and constitute market rates of interest. The rates of interest charged by consumer finance companies are unaffected by, and thus do not in any way reflect, actual economic conditions and are not, therefore, relevant to the determination of current market rates of interest. The court is also of the opinion that the 13% rate of interest used in the Iveys' Chapter 13 plan fairly reflects the market rates of interest charged by local lenders on loans secured by motor vehicles and, therefore, provides Fleet with the present value of its secured claim in this case. The court has reached this conclusion based upon the following:

## FINDINGS OF FACT

1. On July 10, 1989, David and Amelia Ivey borrowed $6,096.09 from Fleet. Under the terms of the promissory note that they executed in favor of Fleet, the Iveys agreed to repay the loan over a period of 36 months with interest at the rate of 21.-09% per annum. To secure repayment of the loan, the Iveys' granted to Fleet a first lien security interest in Amelia Ivey's 1986 Chevrolet truck.

2. The Iveys filed for protection under Chapter 13 of the Bankruptcy Code on May 2, 1990.

3. The Iveys' Chapter 13 plan proposed to pay Fleet the full amount of its secured claim as of the petition date, $5,474.16, with interest at the rate of 13% per annum. Under the plan, Fleet will receive disbursements from the Standing Trustee in the amount of $150.00 per month until its claim is paid in full.

4. On July 5, 1990, Fleet filed an objection to confirmation of the Iveys' Chapter 13 plan because the plan proposed to pay interest at only 13% on Fleet's secured claim. In its objection Fleet requested that the plan be modified to pay interest on Fleet's secured claim at a rate of 21.09%, the contractual rate of interest. Fleet argued that the contractual rate of interest was appropriate because it was: (1) part of the "bargained for agreement"; (2) authorized by North Carolina law; and (3) reasonable under the circumstances.

5. On July 12, 1990, the Iveys' Chapter 13 plan was confirmed, leaving open the interest rate issues raised by Fleet in its objection to confirmation. The order confirming the plan specifically provided for future modification of the interest rate applied to Fleet's secured claim in the event that this or another court so ordered.

6. On November 8, 1990, and later on March 28, 1991, this court conducted hearings on the interest rate issue raised by Fleet in its objection to confirmation of the Iveys' Chapter 13 plan. In addition to the evidence presented at the two hearings, the parties have filed numerous affidavits and several briefs.

7. The evidence presented by Fleet in support of its position can be summarized as follows:

(a) Fleet is authorized by the North Carolina Commissioner of Banks to conduct a consumer finance business pursuant to the provisions of the North Carolina Consumer Finance Act, N.C.Gen.Stat. §§ 53–164 through 53–191.

(b) The provisions of N.C.Gen.Stat. § 53–176 authorize consumer finance businesses to make loans with a term of no less than 6 months and no more than 84 months and in an amount not exceeding $7,500.00.

(c) The statute allows consumer finance businesses to charge interest at rates up to 30% per annum on that part of the principal not exceeding $1,000.00 and 18% per annum on the remainder of the unpaid principal balance.

(d) The rate of interest charged by consumer finance businesses on loans with a

principal amount between $1,000.00 and $7,500.00 is a blended rate of interest.

(e) The 21.09% rate of interest charged by Fleet on its loan to the Iveys is a blended rate of interest calculated pursuant to the provisions of N.C.Gen.Stat. § 53–176: 30% per annum on the first $1,000.00 in principal and 18% per annum on the remainder of the unpaid principal balance.

(f) Although the rates of interest set out in N.C.Gen.Stat. § 53–176 are maximum rates of interest and not mandatory rates of interest, all consumer finance businesses in North Carolina charge the maximum rate allowed by the statute on most, if not all, loans made pursuant to the statute.

(g) Fleet charges the maximum interest rate allowed under N.C.Gen.Stat. § 53–176 on all loans made pursuant to that statute.

(h) The only factor that Fleet considers when setting the interest rate on loans made pursuant to N.C.Gen.Stat. § 53–176 is the maximum rate allowed under the statute.

(i) The interest rate charged by Fleet on loans made pursuant to N.C.Gen.Stat. § 53–176 is not affected by the rates at which Fleet borrows money.

(j) The interest rate charged by Fleet on loans made pursuant to N.C.Gen.Stat. § 53–176 is not affected by changes in the prime rate of interest.

(k) The interest rate charged by Fleet on loans made pursuant to N.C.Gen.Stat. § 53–176 is not affected by the type of loan (secured or unsecured) involved.

(l) The interest rate charged on loans made by Fleet pursuant to N.C.Gen.Stat. § 53–176 is not affected by the creditworthiness of the borrower.

(m) In contrast, Fleet's decision to extend credit is affected by several factors: the borrower's ability to repay, the borrower's credit history and the value of the collateral, if any, securing the loan.

(n) Fleet and most, if not all, consumer finance companies make loans secured by motor vehicles.

(o) Other lenders also make loans secured by motor vehicles. These lenders include banks, savings and loan associations, credit unions and captive finance companies owned by, or related to, automobile manufacturers.

(p) Consumer finance companies are very different in character and operation from the other types of lenders that make vehicle loans.

8. The Standing Trustee presented the following evidence to show that the 13% rate of interest used in the Iveys' Chapter 13 plan reflects current market rates of interest and was not arbitrarily selected:

(a) The current rate of interest proposed by the Standing Trustee on claims secured by motor vehicles is the contractual rate of interest or 13% per annum, whichever is less.

(b) The 13% maximum rate of interest for claims secured by motor vehicles was originally selected by the Standing Trustee as the result of a survey conducted in 1988.

(c) Prior to August, 1988, the rate of interest proposed by the Standing Trustee for claims secured by motor vehicles was the contractual rate of interest or 15%, whichever was less.

(d) In August, 1988, the three Standing Trustees for the Middle District of North Carolina surveyed local lending institutions to determine what rates of interest those institutions were charging on loans secured by motor vehicles.

(e) Upon the completion of their survey, the three Standing Trustees met and discussed the information that they had collected and concluded that interest rates charged by the creditor community on vehicle loans were generally declining.

(f) Following the survey, the Standing Trustees for Winston–Salem and Greensboro reduced the maximum proposed interest rate on claims secured by motor vehicles to 13% and the Standing Trustee for Durham reduced the maximum proposed interest rate for cases in his office to 12%.

(g) Since the 1988 survey, the Standing Trustee has met at least four times annu-

ally with the other Standing Trustees for the Middle District of North Carolina to discuss issues and procedures relating to Chapter 13 cases, including the issue of whether the interest rate presently proposed for claims secured by motor vehicles reflects a reasonable market rate of interest for such loans.

(h) Since the 1988 survey, the Standing Trustee has contacted local banks, savings and loan associations and credit unions several times a year to monitor the interest rates charged by local lenders on vehicle loans.

(i) In addition to continually monitoring interest rates charged by local lenders and regularly discussing interest rates with the other Standing Trustees, the Standing Trustee regularly reviews hundreds of creditor claims each month, including a minimum of 50 claims per month filed by creditors holding liens on motor vehicles.

(j) In reviewing claims filed by creditors holding liens on motor vehicles, the Standing Trustee regularly observes interest rates ranging from 8% to 21% and higher.

(k) In reviewing claims filed in 1990 by creditors holding liens on motor vehicles, the Standing Trustee has observed that the average rate of interest on such claims (excluding claims filed by consumer finance companies) is approximately 13%.

(*l*) Among the creditors surveyed by the Standing Trustee regarding interest rates charged on loans secured by motor vehicles were Reynolds Carolina Credit Union, a major credit union in Winston-Salem, and Southern National Bank, a major banking institution in the area.

(m) In 1989, Reynolds Carolina Credit Union charged 11% to 11½% interest on loans secured by new vehicles and 12% to 12½% interest on loans secured by used vehicles.

(n) In 1990, Reynolds Carolina Credit Union charged 9½% to 10% on loans secured by new vehicles and 10½% to 11% interest on loans secured by used vehicles.

(o) In 1989, Southern National Bank charged 12–13% interest on loans secured by new vehicles and 13–14% interest on loans secured by used vehicles.

(p) In 1990, Southern National Bank charged 11–12% interest on loans secured by new vehicles and 12–13% interest on loans secured by used vehicles.

(q) The interest rates charged by Reynolds Carolina Credit Union and Southern National Bank generally are lower for secured loans than for unsecured loans.

(r) The interest rates charged by Reynolds Carolina Credit Union and Southern National Bank generally reflect changes in the prime rate of interest, increasing as the prime rate goes up and decreasing as the prime rate goes down.

(s) The prime rate of interest declined during 1989 and 1990.

(t) The prime rate of interest as of the date of the March 28 hearing was 9%.

9. The Standing Trustee presented extensive evidence regarding the manner in which Chapter 13 cases are handled by her office, which can be summarized as follows:

(a) The role of the Standing Trustees in Chapter 13 cases in the Middle District of North Carolina is a very active one.

(b) The office of the Standing Trustee assists Chapter 13 debtors in formulating their Chapter 13 plans.

(c) As part of the plan formulation process, members of the Standing Trustee's staff interview each Chapter 13 debtor individually and discuss in depth the debtor's income, expenses and general financial situation.

(d) Based upon information gathered in the initial interview regarding the types of claims in the case, the debtor's income and living expenses, members of the Standing Trustee's staff make recommendations to the debtor as to the size and allocation of plan payments.

(e) The office of the Standing Trustee administers the Chapter 13 case, collecting and disbursing payments according to the terms of the Chapter 13 plan.

(f) Claims secured by motor vehicles are routinely paid by disbursements through the office of the Standing Trustee.

(g) Each plan payment received by the office of the Standing Trustee is disbursed first to mortgage claims, then pro-rata to other secured claims (including claims secured by motor vehicles), then to unsecured claims.

(h) If a debtor becomes delinquent in his Chapter 13 plan payments, the Standing Trustee files a motion with the court to dismiss the debtor's Chapter 13 case.

(h) If a debtor fails to maintain liability and collision insurance on his motor vehicle, the Standing Trustee issues a storage notice that directs the debtor to place the vehicle in the possession of the secured creditor until the debtor's insurance is reinstated.

10. The Standing Trustee indicated to the court that she was concerned about the possible negative effects of changing the present procedures by which Chapter 13 plans are formulated and the manner in which claims secured by motor vehicles are handled for the following reasons:

(a) In spite of the tremendous increase in bankruptcy filings in the last year, the office of the Standing Trustee is able to handle the Chapter 13 case load at this time.

(b) If, however, the plan formulation procedure were expanded to require interest rate hearings in each case such as the hearings that were conducted in this case, the Standing Trustee would have to increase her staff.

(c) With any increase in staff in the office of the Standing Trustee, there would be a corresponding increase in the cost of administering each Chapter 13 case.

(d) With any increase in the cost of administering a Chapter 13 case, there would be a corresponding decrease in the funds available for unsecured creditors.

(e) Expanding the plan formulation procedure to include interest rate hearings would delay confirmation of the plan.

(f) Since the Standing Trustee is not authorized to disburse funds to creditors until a plan is confirmed, any delay in confirmation would delay the administration of the Chapter 13 case and disbursement to creditors.

(g) In this district the Standing Trustee takes an active role in formulating Chapter 13 plans to increase the likelihood that the Chapter 13 debtor will successfully complete his or her Chapter 13 plan.

(h) In this district debtors are strongly encouraged to elect Chapter 13 over Chapter 7. Chapter 13 generally provides a substantially greater benefit to unsecured creditors.

(i) Chapter 13 plans are set up by the office of the Standing Trustee to utilize all of a debtor's disposable income.

(j) Because of the way that Chapter 13 plans are set up, any increase in the interest rate paid on a secured claim in a Chapter 13 case decreases the dividend available to the unsecured creditors.

## DISCUSSION

In the present matter the parties have agreed that Chapter 13 plans must provide for the payment of interest on secured claims at a market rate of interest for similar types of loans in the area. In order to determine whether a particular rate of interest is a "market" rate of interest for similar types of loans in the area, the court must first determine what type of loan and what market area are involved. Once the court has defined the type of loan and the market area involved, the court must then determine what rate of interest lenders are charging for similar loans in the area. *See, e.g., Memphis Bank & Trust Company v. Whitman,* 692 F.2d 427 (6th Cir.1982) ("in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region").

It appears to be undisputed that, for purposes of this discussion, the relevant market area is the state of North Carolina. It also appears, however, that the parties have dramatically different ideas as to how the court should define the relevant type of loan.

Fleet argues that only loans made by consumer finance businesses pursuant to

N.C.Gen.Stat. § 53–176 are sufficiently "similar" to Fleet's loan to the Iveys to be relevant to the court's inquiry. In support of its argument, Fleet points out the unique history and nature of the consumer finance business in North Carolina, and the differences between consumer finance businesses and other lenders that finance vehicles, such as banks, savings and loan associations, credit unions and captive finance agencies. Fleet contends that consumer finance companies are completely different in character from these other lenders and that the vehicle loans made by consumer finance companies are likewise completely different from the vehicle loans made by these other lenders. Thus, Fleet concludes, the court should define the type of loan relevant to this matter as "vehicle loans made by consumer finance businesses pursuant to N.C.Gen.Stat. § 53–176."

The court agrees with Fleet that consumer finance businesses are very different in character from other types of lenders that make vehicle loans, such as banks, savings and loan associations, captive finance companies and credit unions. However, the court does not agree that the vehicle loans made by consumer finance companies are completely different from the vehicle loans made by other types of lenders. In fact, the evidence presented to the court established that all lenders making vehicle loans considered the same basic factors when deciding whether or not to make the loan, including such factors as: the borrower's ability to repay the loan, the borrower's credit history and the value of the vehicle securing the loan. Although some lenders were willing to finance vehicles for individuals that other lenders considered too risky, the basic decision making process was the same for all.

Finding no significant differences in the lending criteria or procedures of the various types of lenders making vehicle loans, the court finds that "similar types of loans in the area" means "consumer loans secured by motor vehicles made in North Carolina." Having so found, the court must now determine what rates of interest constitute market rates of interest on such loans.

Market rates of interest are the best indicators of the present value of deferred payments because they are products of supply and demand, reflecting the interaction of economic variables that affect the cost of lending money. *See In re Benford,* 14 B.R. 157 (Bankr.W.D.Ky.1981). As previously stated, the court is of the opinion that the rates of interest presently charged by lenders such as banks, savings and loan associations, credit unions and captive finance companies represent market rates of interest. This court is also of the opinion that, based upon the evidence presented, the rates of interest charged by consumer finance companies are not relevant to any discussion of market rates of interest.

North Carolina consumer finance companies set the interest rates charged on all loans made pursuant to N.C.Gen.Stat. § 53–176 solely by reference to the statute. According to Fleet's own witness, consumers pay the maximum rate of interest allowed under the statute on virtually all, if not all, loans made pursuant to the statute. Changes in the rates of interest charged by other types of lenders, such as banks, do not affect the interest rates charged by consumer finance companies. Changes in the prime rate of interest do not affect the rates of interest charged by consumer finance companies. Changes in the rates at which consumer finance companies borrow money do not affect the rates of interest charged by consumer finance companies. Accordingly, it appears to the court that the interest rates charged by consumer finance companies are not responsive to changing economic conditions and should not be considered "market" rates of interest for purposes of determining the present value of secured claims in Chapter 13 plans. The court will, therefore, limit its discussion of market rates of interest on loans secured by motor vehicles to the rates of interest charged on such loans by banks, savings and loan associations, credit unions and captive finance companies.

Claims filed in the Standing Trustee's office during the period from August 1, 1988 to January 1, 1991, reflected that

lenders such as banks, savings and loan associations, credit unions and captive finance companies charged interest on loans secured by motor vehicles at rates as high as 29% and as low as 9.9%. At the time that the Iveys Chapter 13 plan was confirmed, a major bank in the area was charging 11–13% interest on vehicle loans and a major credit union in the area was charging 9½–11% interest. It also appears to the court from the evidence presented that the 13% interest rate used in the Iveys' Chapter 13 plan fairly reflects current market rates of interest charged in the area on consumer loans secured by motor vehicles. It also appears to the court that the Standing Trustee's method for determining the rate of interest that Chapter 13 plans should pay on claims secured by motor vehicles produces a rate that fairly reflects current market rates of interest.

## CONCLUSION

As the holder of a claim secured by a motor vehicle which the debtors wish to keep under their Chapter 13 plan, Fleet is entitled to receive under the plan property with a present value equal to the value of its secured claim pursuant to 11 U.S.C. § 1325(a)(5)(B). By providing for the payment of interest at the rate of 13% per annum on Fleet's secured claim, the Iveys' Chapter 13 plan provides Fleet with the present value of its secured claim. Therefore, the court finds that the Iveys' Chapter 13 plan meets the requirements for confirmation as set out in § 1325 of the Bankruptcy Code.

## ORDER

Pursuant to the Memorandum Opinion entered contemporaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the objection of Fleet Finance, Inc. to confirmation of the Chapter 13 plan of David G. Ivey and Amelia D. Ivey is hereby denied and the plan is confirmed as proposed.