**In re Abraham CURETON and Diane Cureton, Debtors.**

**Bankruptcy No. 93–30904.**

United States Bankruptcy Court, E.D. Michigan, S.D. at Flint.

Feb. 3, 1994.

---

Barbara Pietila Foley, Flint, MI, for debtors.

Steve Sowell, Troy, MI, for Barclays American.

Carl L. Bekofske, Chapter 13 Trustee.

---

## MEMORANDUM OPINION REGARDING OBJECTION TO PLAN

ARTHUR J. SPECTOR, Bankruptcy Judge.

On August 9, 1993, Barclays American Mortgage Corporation filed an objection to confirmation of the Debtors' plan. Although there are several grounds for this objection, the only one which remains unresolved is set forth in paragraph two of Barclays' objection, which states as follows:

The debtor's plan provides, in paragraph 3, that arrears on the debt to Barclays American shall be paid with interest at the rate of 7% per annum. The actual interest rate as provided in the mortgage and note is 14.875%. Because Barclays American is secured only by a first mortgage on the debtor's principle [sic] residence, the right of Barclays American to payment of interest at the contract rate cannot be modified. See 11 U.S.C. § 1322(b)(2).

Objections to confirmation of plan at ¶ 2. A hearing was held on November 23, 1993, and the Court took the matter under advisement.

Section 1322(b)(2) states that a chapter 13 plan cannot "modify the rights of holders of . . . a claim secured only by a security interest in real property that is the debtor's principal residence." Section 1322(b)(5) states that, "notwithstanding [§ 1322(b)(2), a chapter plan may] provide for the curing of any default within a reasonable time . . . on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." In *In re Colegrove*, 771 F.2d 119 (6th Cir.1985), the court of appeals for this circuit held that a debtor who cures an arrearage under the latter section must pay "the prevailing market rate of interest on similar types of secured loans at the time of the allowance of the creditors claim and the con-

firmation of the plan in bankruptcy with a *maximum limitation* on such rate to be the underlying contract rate of interest." *Id.* at 123.[1]

Subsequent to *Colegrove*, the Supreme Court rendered a decision which made it fairly clear that the Court views § 1322(b)(2) as rendering a principal residential mortgagee's contract rights inviolable, except where the Code (or, presumably, any other applicable law) provides to the contrary. *See Nobelman v. American Savings Bank*, —— U.S. ——, —— – ——, 113 S.Ct. 2106, 2109–11, 124 L.Ed.2d 228, 234–36 (1993). A second Supreme Court decision implicitly confirmed what one could readily infer from a straightforward reading of § 1322(b)(5), which is that that section does not purport to negate a home mortgagee's contractual right to collect interest on arrearages. *See Rake v. Wade*, —— U.S. ——, ——, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424, 433 (1993) ("While § 1322(b)(5) authorizes a Chapter 13 plan to provide for payments on arrearages to effectuate a cure after the effective date of the plan, nothing in that provision dictates the terms of the cure.").

The Supreme Court's decision in *Nobelman*, particularly when read in conjunction with *Rake*, suggests that *Colegrove* has been overruled insofar as the latter decision authorized a debtor to pay less than the rate of interest to which a mortgagee is contractually entitled when the debtor cures arrearages on a debt protected by § 1322(b)(2). It was this issue that was specifically reserved by the Court for consideration; but, for the reasons to be explained, it need not be addressed.

As noted earlier, § 1322(b)(5) allows for a chapter 13 plan to "provide for the curing of any default." To implement that right, the

---

1. The court's reference to the "underlying contract rate of interest" should be understood as simply meaning the rate at which interest accrues on the unpaid portion of the amount borrowed by the mortgagor. *See Colegrove,* 771 F.2d at 123 ("[T]he most widely accepted approach has been to limit the creditor to the [interest] rate provided for in the original loan agreement. This . . . view has been rationalized by the fact that '*the contract rate is the rate which the parties agreed was a fair return to the creditor*

*for the debtor's repayment of the loan* over an extended period of time.'" (emphasis added; citation omitted)). Quite a different matter is whether the parties' contract specifies an interest rate at which a default may be cured over time—in other words, whether the contract contains a provision that in effect permits the mortgagor to obtain a second loan, at a stated rate of interest, to be used to pay arrears that have accumulated on the first loan. *See infra* pp. 495–96.

debtor must determine that sum which must be paid in order to "deaccelerate" or "reinstate" the mortgage. *See, e.g., Sapos v. Provident Inst. of Sav.*, 967 F.2d 918, 926 (3d Cir.1992); *In re Clark*, 738 F.2d 869, 872 (7th Cir.1984). This sum—the arrears—will typically include missed monthly mortgage payments, late fees and, possibly, miscellaneous expenses such as attorney fees incurred by the mortgagee. *See generally 5 Norton Bankruptcy Law and Practice 2d* § 121:8 at pp. 121–84 to 121–86. Because § 1322(b)(5) gives the debtor a right to cure the arrears "notwithstanding" the protection from modification afforded by § 1322(b)(2), it makes no difference whether the parties' contract gives the mortgagor such a right. *See Rake,* —— U.S. at —— n. 9, 113 S.Ct. at 2193 n. 9, 124 L.Ed.2d at 434 n. 9.

In this case, paragraphs 18 and 19 of the mortgage and paragraph 6(c) of the promissory note executed by the Debtors do give them rights analogous to that which is guaranteed by § 1322(b)(5). But these provisions simply require that the arrearage be cured within a specified period of time. Under paragraph 18, the arrears must be cured "prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in the Security Instrument; or (b) entry of a judgment enforcing this Security Instrument." Under paragraph 19, Barclays' notice of acceleration must give the Debtors "not less than 30 days from the date the notice is given to [the Debtors], by which the default must be cured." Similarly, paragraph 6(c) of the note states that notice of acceleration will provide the Debtors with the opportunity to "pay the overdue amount by a certain date ... [, which] date must be at least 30 days after the date on which the notice is delivered or mailed."

Thus the mortgage and note contemplate that the cure payment be made in a lump sum. In contrast, § 1322(b)(5) allows a debtor to pay the arrears, not in a lump sum on day one of the plan, but rather "within a reasonable time." There is nothing in the parties' note or mortgage which even arguably purports to give the Debtors the right to "string out" the cure payment over time, much less define the applicable rate of interest to be paid by the Debtors should they choose to exercise that right. And since there is no provision for such interest, the Debtors' plan does not "modify" Barclays' contractual rights in violation of § 1322(b)(2).

Barclays based its objection on paragraph 2 of the parties' promissory note, which provides that the Debtors must pay the stated interest rate of 14.875% on unpaid principal "both before and after any default." But this provision clearly does not speak to the question of what interest rate applies to an "installment cure" of the type authorized by § 1322(b)(5).

Of course, Barclays' rights under paragraph 2 of the note might be impaired if either § 1322(b)(5) or the Debtors' plan obliged Barclays to credit unpaid principal as if the arrears were paid in full on the effective date of the plan. How this could happen is best illustrated by a hypothetical.

Assume that a chapter 13 debtor owes $5,000.00 in arrears that must be paid under § 1322(b)(5), of which $1,000 represents unpaid principal. If the entire $5,000 were paid up front, the debtor's principal balance would decrease by $1,000. If the arrears are paid over time, however, the mortgagee presumably will not apply any portion of the installment payments to principal until other components of the arrearage, e.g., late fees, interest, etc., have been paid.[2] By this method of accounting, the debtor's cure payments do not begin to touch principal until, say, two years after plan confirmation. Thus during the first two years of the plan, interest is accruing at the "contract rate"[3] on $1,000 in principal that would have been credited as

---

2. In this regard, the parties' mortgage contains a provision governing the application of payments which is probably standard. Paragraph 3 of that instrument states that, "[u]nless applicable law provides otherwise, all payments received by Lender ... shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to [escrow items]; fourth, to interest due; and last, to principal due."

3. I use this term in the same sense as did the court in *Colegrove. See supra* n. 1.

paid had the debtor fully cured the default upon plan confirmation.

So long as the mortgagee in this hypothetical is permitted to allocate cure payments such that principal is the last item to which the payments are applied, then it cannot be said that the cure under § 1322(b)(5) compromises its right to interest at the contract rate on unpaid principal. But if the mortgagee is required to treat the cure as a lump-sum payment,[4] it can plausibly argue that this right is modified in violation of § 1322(b)(2) because it must forego interest at the contract rate on unpaid principal—i.e., the $1,000 that must be credited prior to actual payment.

Depending on how the Debtors' cure payments are credited by Barclays, then, paragraph 2 of the parties' note may be implicated. For a number of reasons, however, I do not consider whether this constitutes grounds for sustaining Barclays' objection.

First, Barclays did not premise its objection to the Debtors' plan on this theory, and thus there was no argument from the parties as to its validity. *Cf. Ladner v. United States,* 358 U.S. 169, 173, 79 S.Ct. 209, 211, 3 L.Ed.2d 199 (1958) (declining to consider an "important and complex" issue with respect to which "there was only meager argument"). Second, the plan does not purport to require that Barclays treat the "delayed cure" under § 1322(b)(5) as a constructive lump-sum payment. Finally, if § 1322(b)(5) itself imposes such a requirement, then any modification of Barclays' rights under paragraph 2 of the note is permissible "notwithstanding" § 1322(b)(2).

Based on the foregoing, an order will enter overruling Barclays' objection.

### ORDER OVERRULING OBJECTION OF BARCLAYS AMERICAN MORTGAGE CORPORATION TO CONFIRMATION OF THE DEBTORS' PLAN

For the reasons stated in the Memorandum Opinion of even date,

**IT IS HEREBY ORDERED** that the objection of Barclays American Mortgage Corporation to confirmation of the Debtors' plan is overruled.

---

**4.** The argument for this requirement is probably strongest where, as here, the debtor's cure is to be made with interest at the market rate. Under such circumstances, the mortgagee is receiving the financial equivalent of a lump-sum payment because the present value of the installment payments is, by definition, equal to the amount of the arrears. *See Rake,* —— U.S. at —— n. 8, 113 S.Ct. at 2192 n. 8, 124 L.Ed.2d at 433 n. 8; *Colegrove,* 771 F.2d at 121–23.