**In re Mary L. LEWIS, Debtor.**

**Bankruptcy No. 93–1–3733–PM.**

United States Bankruptcy Court, D. Maryland, at Rockville.

Aug. 9, 1994.

Thomas Lackey, Chapter 13 Trustee.

R. Douglas Jones, Glendale Federal Bank, F.S.B.

Lawrence F. Regan, Jr., for debtor.

James M. Hoffman, Gregory P. Johnson, amicus curiae.

## MEMORANDUM OF DECISION

PAUL MANNES, Chief Judge.

This case is before the court for confirmation of Mary Lewis' Chapter 13 plan. Because of the recurring nature of the issue presented,[1] the Bankruptcy Bar Association for the District of Maryland ("BBA") was invited to select persons to file amicus curiae briefs. An amicus brief was filed by James M. Hoffman, Esquire, and Gregory P. Johnson, Esquire, at the request of the BBA, but in their individual capacities. The court is grateful to these attorneys for their contribution.

The court has jurisdiction pursuant to 28 U.S.C. § 1334 (District Courts have original and exclusive jurisdiction of all cases under Title 11), and 28 U.S.C. § 157(a) and Maryland District Court Local Rule 402 (all cases under Title 11 as proceedings arising under Title 11 or arising in or related to cases under Title 11 are deemed referred to the Bankruptcy Judges of this District). This action constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(L).

### Issue Presented

In *Rake v. Wade*, —— U.S. ——, ——, 113 S.Ct. 2187, 2189, 124 L.Ed.2d 424 (1993), the Supreme Court concluded that when Chapter 13 debtors cure a default on an oversecured home mortgage pursuant to § 1322(b)(5)[2] of the Bankruptcy Code that the holder of the home mortgage is entitled to interest on the arrearages even if the mortgage instruments do not provide for interest on the arrearages. However, the Court noted: "[b]ecause the

---

1. There were 4,130 Chapter 13 cases filed in the District of Maryland in 1993. It is the court's best estimate that 75% involved home mortgages and of these 80% involved an oversecured mortgagee's claim.

2. All references to statutory sections are to the Bankruptcy Reform Act of 1978 (the "Code" or "Bankruptcy Code"), as amended, 11 U.S.C. § 101 et seq.

issue is not presented in this case, we express no view on the appropriate rate of interest that debtors must pay on arrearages cured pursuant to § 1322(b)(5)." *Id.* at ——, n. 8, 113 S.Ct. at 2192, n. 8. Here, this court is presented with that issue—what is the appropriate rate of interest that debtors must pay on prepetition arrearages to oversecured creditors holding claims that are secured only by debtors' principal residence?

### *Statutory Provisions*

The following statutory provisions are pertinent:

**§ 506.  Determination of secured status.**

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

**§ 1322.  Contents of plan.**

(b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

**§ 1325.  Confirmation of plan.**

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim;  and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim;  or

(C) the debtor surrenders the property securing such claim to such holder.

### *Statement of the Case*

This case under Chapter 13 of the Bankruptcy Code was filed on July 1, 1993. Debtor's Chapter 13 plan provides for the payment of $324.00 a month to the trustee for a 60–month period. After the payment of the statutory fee to the trustee pursuant to 28 U.S.C. § 586(e)(1)(B), debtor's plan proposed payment of prepetition arrearages plus interest at the rate of 7.5% per annum to Glendale Federal Bank, F.S.B. ("Glendale") and prepetition arrearages to Tucker Anthony, Inc., plus interest at the rate of 9% per annum. Postpetition payments to these creditors were to be made directly to them by debtor. No provision was made in the plan for Chrysler Credit Corporation, the holder of a note secured by debtor's automobile, as that debt was to be paid "outside the plan." The balance of the funds paid to the trustee were to be distributed pro rata among unsecured creditors filing proofs of claim. Glendale is the holder of a 30–year note secured by a first deed of trust on debtor's principal residence dated February 1, 1985, in the amount of $101,000.00 at a fixed interest rate of 12.5%, executed by the debtor and her non-filing spouse. Tucker Anthony, Inc., is the holder of a note secured by a junior lien on the residence.

Glendale filed a proof of claim on August 9, 1993, in the aggregate amount of $109,257.26. The proof of claim reflects prepetition arrearages of $14,418.18. Interest is claimed at the note rate of 12.5% for the duration of the plan. It is uncontroverted that the Glendale's claim is oversecured. Glendale urges that the plan must provide for the payment of arrearages with interest at the contract rate of 12.5%. Thomas L. Lackey, the standing Chapter 13 trustee for this division ob-

jected to confirmation of the plan for the reason that the plan did not propose to pay the present value of Glendale's claim.

## Legal Analysis

▌ The current debate as to the appropriate rate of interest to be fixed on prepetition arrearages cures in Chapter 13 plans was focused by the Supreme Court's identification in *Nobelman v. American Sav. Bank,* — U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), on creditors' "rights" as they are embodied in the mortgage instruments securing their loans. The Court identified those "rights" as follows:

> They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure. These are the rights that were "bargained for by the mortgagor and the mortgagee," *Dewsnup v. Timm,* 502 U.S. 410, ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), and are rights protected from modification by § 1322(b)(2).

*Id.* at ——, 113 S.Ct. at 2110. The recognition of these rights coupled with §§ 506, 1322 and 1325 entitles an oversecured mortgagee to interest during the bankruptcy case on prepetition arrearages.

Justice Stevens concurred in *Nobelman* but explained the superficial irony of the Code's providing "less protection to an individual's interest in retaining possession of his or her house than of other assets." *Id.* at ———–——, 113 S.Ct. at 2111–12. He finds an explanation for this anomaly in the legislative history that champions favorable treatment for residential mortgagees in order to encourage capital availability in the home lending market. *Id.* at ——, 113 S.Ct. at 2121. However, the Court's opinion recognized that the mortgagee's rights are not unaffected in bankruptcy. For example, the ability to foreclose on the property is limited by § 362(a), and debtor may cure prepetition arrearages under § 1322(b)(5), notwithstanding § 1322(b)(2). *Id.* at ——, 113 S.Ct. at 2110.

In *Rake v. Wade,* — U.S. ——, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), the Supreme Court held that when the holder of a home mortgage claim is oversecured, the holder is entitled to postconfirmation interest on prepetition arrearages. In *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), the Court affirmed the unqualified right of holders of oversecured claims to postpetition interest under § 506(b). The right exists whether or not the agreement giving rise to the claim provides for interest. The interest allowed by § 506(b) will accrue until payment of the secured claim or until the effective date of the plan, *Rake v. Wade,* — U.S. at ——, 113 S.Ct. at 2190; *In re Foertsch,* 167 B.R. 555, 560 (BC N.D.1994).

The Court explained with respect to cases under Chapter 13:

> Section 1322(b)(5), on the other hand, states that a Chapter 13 plan may "provide for the curing of any default and the maintenance of payments" on certain claims. While § 1322(b)(5) authorizes a Chapter 13 plan to provide for payments on arrearages to effectuate a cure after the effective date of the plan, nothing in that provision dictates the terms of the cure. In particular, § 1322(b)(5) provides no indication that the allowed amount of the arrearages cured under the plan may not include interest otherwise available as part of the oversecured claim under § 506(b). We generally avoid construing one provision in a statute so as to suspend or supersede another provision. To avoid "deny[ing] effect to a part of a statute," we accord "'significance and effect ... to every word.'" *Ex parte Public Nat. Bank of New York,* 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202 (1928) (quoting *Washington Market Co. v. Hoffman,* 101 U.S. 112, 115, 25 L.Ed. 782 (1879)). Construing §§ 506(b) and 1322(b)(5) together, and giving effect to both, we conclude that § 1322(b)(5) authorizes a debtor to cure a default on a home mortgage by making payments on arrearages under a Chapter

13 plan, and that where the mortgagee's claim is oversecured, § 506(b) entitles the mortgagee to preconfirmation interest on such arrearages.

*Rake v. Wade,* —— U.S. at ——, 113 S.Ct. at 2192.

The Court then dealt with entitlement to postconfirmation interest. It held that the most natural reading of § 1325(a)(5) is that the home mortgage arrearages were "provided for" by the plans. The treatment generally is to split the claims by establishing a repayment schedule for the arrearages. Payments of principal and interest on the underlying debt are "maintained" according to the terms of the mortgage documents as if there were no default. The arrearage portion is repackaged under the plan; thus, the holder of the oversecured claim is entitled to interest on the arrearages under § 1325(a)(5)(B)(ii) as with any other oversecured claim. *Rake v. Wade,* at —— —— ——, 113 S.Ct. at 2192–93.

■ This court and others have the task to ascertain the appropriate rate of interest that the debtors must pay on the arrearages cured pursuant to § 1322(b)(5). The debtor, as plan proponent, bears the ultimate burden to prove that all confirmation criteria are met. *In re Johnson,* 145 B.R. 108, 111 (BC S.D.Ga.1992); *In re Girdaukas,* 92 B.R. 373, 376 (BC E.D.Wis.1988); *In re Pagnotta,* 1993 WL 498197, 1993 Bankr. LEXIS 1797 (BC E.D.Pa.1993).

In fixing the appropriate rate of interest for oversecured creditors there are various options, including the contract rate, bringing with it ease of calculation, the market rate, assuming that a market exists in loans to delinquent but recovering debtors, or some other possibility. The large number of cases affected tempts the court to adopt the most easily-applied standard.

No one has discussed any consequences of the impact of the payment of the arrearages upon the principal balance of the mortgage. *Cf. In re Cureton,* 163 B.R. 494, 496–97 (BC E.D.Mich.1994).

After a thorough analysis, the *amicus* brief suggests that the court select a market rate of interest under the riskless rate approach

plus an enhancement. This approach, it is urged, reflects market conditions, fairly compensates the note holder in a manner similar to that if the collateral were liquidated, reduces expense for all parties and is easy to administer. Messrs. Johnson and Hoffman suggest that the coerced loan approach, while made applicable by the Fourth Circuit to cramdown situations, is not relevant because there is no means to research similar loans in the marketplace. Debtor argues that the court adopt a present value analysis capped by the Maryland judgment rate of 10%. Glendale argues that the contract rate applies.

The *amicus* reiterates that *Rake v. Wade* points out that under § 1325(a)(5)(B) the holder of the oversecured claim is entitled to receive the present value of the arrearages paid off under the terms of the plan. The Court explained in the first sentence of footnote 8:

> When a claim is paid off pursuant to a stream of future payments, a creditor receives the "present value" of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments. This generally involves a determination of an appropriate discount rate and a discounting of the stream of deferred payments back to the present dollar value of the claim at confirmation.

*Rake v. Wade,* —— U.S. at —— —— ——, 113 S.Ct. at 2192–93. The *amicus* brief then described how one determines "present value." It described and criticized various approaches and urged that this court follow the riskless rate approach plus enhancement as described in the case of *In re Ivey,* 147 B.R. 109, 113, (M.D.N.C.1992), *aff'g* 131 B.R. 43 (BC E.D.N.C.1991). The *amicus* urges that this analysis reflects market conditions, fairly compensates a mortgagee for use of the arrearages, compensates it in a manner similar to the use of the collateral, reduces expenses for the parties, and is easy to administer.

While *Ivey* involved a cramdown of an undersecured creditor's interest in a truck,

the discussion is instructive. The court noted that,

> [t]he case law with regard to an appropriate discount rate has created numerous, conflicting, "and sometimes indecipherable formulas as the courts have tried to implement the fact specific market analysis approach." *In re Computer Optics,* 126 B.R. [664] at 671 [Bkrtcy.D.N.H.1991]. See also, Carbiener, *supra,* at 46–47. Indeed a review of the case law reveals numerous methods of calculating a discount rate including: (1) the current market rate for similar loans (the coerced loan theory), (2) the rate the creditor must pay to replace funds (cost of funds theory), (3) the "riskless" rate with an upward adjustment, (4) the contract price, (5) the IRS judgment rate set by 26 U.S.C. § 6621, (6) statutory judgment rate, and (7) the Treasury Bill rate.
>
> \* \* \* \* \* \*
>
> Given these inherent limitations of market theory the obvious question is, how should the court determine a proper discount rate? It seems to this court that the starting point should be to use market theory to the extent possible, that is, to determine the riskless rate of interest based presumably on a treasury bond rate reflecting the terms and payout period of the deferred payment plan. Then the court must determine what risk premium, if any, is an appropriate addition.
>
> \* \* \* \* \* \*
>
> The point is that in determining the risk premium to added to the riskless rate of interest, the courts should explicitly focus on the rights of the parties, balancing the interests sought to be furthered by bankruptcy law. After all, this is what the parties care about. Furthermore, courts are more adept at balancing rights than they are at expounding economic theory.

*In re Ivey,* 147 B.R. 109, 118 (M.D.N.C.1992).

Resolution of the issue presented has been a nationwide effort. *See,* Lundin, *Chapter 13* *Bankruptcy,* § 4.55 (2d ed. 1994), Bihary, *From the Bench,* 6 NACTT Quarterly 24, National Association of Chapter 13 Trustees, April, 1994. *In re Harned,* 166 B.R. 255 (BC E.D.Pa.1994), contains a thoughtful discussion of this issue by a court subject to the Third Circuit decision in *General Motors Acceptance Corporation v. Jones,* 999 F.2d 63, 71 (CA3 1993).[3]

This court's selection of the appropriate rate of interest is informed by *United Carolina Bank v. Hall,* 993 F.2d 1126 (CA4 1993). There, debtor purchased a mobile home, making a cash payment of $3,100.00 and financing the balance at 13% interest. Through the Chapter 13 plan, debtor sought to retain possession of her mobile home by "cramming down" the secured creditor under § 1325(a)(5)(B). The plan provided payment to the bank of the "current full value" of the mobile home with 10% interest over 58 months.

The bank objected, urging that the appropriate rate of interest to be paid on the arrearage not be based upon the contract rate of 13% but rather the prevailing local rate on sales of new mobile homes of 13.5% or of used mobile home of 15.5%. On appeal the district court held that in the absence of special circumstances, such as a lower contract rate, the bankruptcy court should use "the current market rate of interest used for similar loans in the region." Because the current rate in the market exceeded the 13% contract rate in the case, the district court ordered that the contract rate be used.

In its opinion affirming the district court, the Fourth Circuit noted:

> When a secured creditor objects to a plan, Chapter 13 provides two alternative courses. The debtor may either surrender the securing property to the secured creditor or, under the "cram down" provision, the debtor may retain possession of the property by (1) recognizing the secured creditor's lien, and (2) providing for pay-

---

**3.** The appropriate interest rate for this purpose is the rate of interest currently being charged by the creditor in the regular course of its business for loans similar in character, amount and duration to the loan being coerced in the cramdown.

It is further appropriate, we hold, for a bankruptcy court to treat the contract rate as a proxy for the creditor's current rate in the absence of a stipulation or evidence to the contrary. 999 F.2d at 71.

ments to the secured creditor that total not less than the value of the lien. If the secured creditor is undersecured, the total must be not less than the value of the securing property at the time the petition is filed. If the plan provides for installment payments from future income, as would be the usual case, the total amount of payments must have a *present value* equal to that of the lien. Accordingly, interest must be included at a rate that compensates the creditor for the delay in receiving the value it would have received more promptly if the debtor had surrendered the collateral under § 1325(a)(5)(C). The issue presented in this case is how to calculate the appropriate rate of interest to pay the secured creditor.

\* \* \* \* \* \*

When it is recognized that the purpose of including interest as part of the installment payments is to place the secured creditor in the same economic position as if the debtor had surrendered the collateral to the secured creditor, the issue of how the applicable interest rate is to be calculated becomes essentially an economic one. Nevertheless, the courts have continued to grapple with the appropriate formulation.

Some courts have suggested that the secured creditor be paid based on the rate at which the secured creditor borrows money, on the assumption that the secured creditor can replace the money tied up in the bankruptcy proceedings and then make new loans to consumers at the then prevailing rates in that market. [Citations omitted.] A major difficulty with this approach, often referred to as the cost of funds approach, however, is its underlying assumption that the secured creditor has an unlimited supply of credit. When it is recognized that every secured creditor has a limited amount of credit on which to draw, then it follows that utilizing some of that borrowing capacity without providing the secured creditor with the usual return on its capital produces a loss for the secured creditor. This loss is measured by the difference between (1) the interest it could have earned in the then current market for loans similar to that to the debtor, less the cost to it of making such a loan, and (2) its cost of borrowed capital. In general, we believe that looking to the rate at which a secured creditor borrows funds presents too great a risk that the payments will not provide a fair present value.

Therefore we conclude that it is fairer to treat the value of the collateral retained by the debtor under the "cram down" provision of Chapter 13 as a new loan and to match its rate of return to the secured creditor with that which the creditor would otherwise be able to obtain in its lending market.

\* \* \* \* \* \*

While we hold that the business opportunity that the secured creditor might otherwise have been able to pursue best determines the present value of the allowed secured claim, and therefore that the district court properly looked to the Bank's lending market in setting an interest rate, we note that the court must be wary of placing the secured party in a better position than that in which it would have been if the debtor surrendered the collateral. We note, for example, that if the collateral had been surrendered, the Bank would have incurred the expenses of liquidating the collateral and of making a new loan in the marketplace. The market practice demonstrated by the evidence in this case is that local mobile home dealers initially incur the expense of placing the loans. The banks then purchase the paper from the dealers at a discount, thus compensating the dealers for this expense. While the evidence showed that mobile home dealers were collecting 13.5% interest for the financing of new mobile home and 15.5% for used mobile homes, the Bank might be receiving less. If the Bank generally makes the loan directly to consumers, the interest rate it collects, adjusted for its expenses, may be used to determine the appropriate rate of interest under the "cram down" provision. But if the Bank generally purchases the finance contracts, the rate reflected by the discounted purchase price is used. In neither case, however, is the gross rate of interest paid by

consumers for similar loans used without accounting for the Bank's expenses.

Thus, in determining the appropriate amount of interest to pay the secured creditor under the "cram down" provision of Chapter 13, we reject a rule which realizes to the secured creditor only its cost of funds. Rather, we adopt a rule that looks to the secured creditor's lending market in determining what rate of interest best provides the secured creditor with its present value, *taking into account not only the rates which it obtains from similar loans in the area but also its expenses in obtaining those loans, either by its own underwriting or in its purchases from dealers.*

*Finally, so as to eliminate a windfall benefit to the secured creditor, the district court capped any interest rate used in the "cram down" situation at the contract amount to which the secured creditor had originally agreed.* See *In re Mellema,* 124 B.R. 103, 107–08 (Bankr.D.Colo.1991). As a matter of equity, *we agree with that limitation.*

*United Carolina Bank v. Hall,* 993 F.2d 1126, 1130–31 (CA4 1993). (Emphasis added.)

■ Thus, the task of a court within the Fourth Circuit is ascertain the interest rate currently charged by the secured creditor or similar lenders. Many times this can be determined from the creditor's posted rates at its place of business or from its advertising. But it is uneconomic to have the parties in each case bear the cost of ascertaining the creditor's underwriting costs or costs of purchasing similar loans. Some generally applicable principles may be deduced. It is reasonable to infer some correlation between the rate of interest charged and the expense, i.e., the higher the interest rate charged the greater the expense factor. Here, the burden must be placed upon the lender to come forward with the information required because of its access to the necessary data and its desire to protect proprietary information. But there can be no argument that the restructured loan is less costly to the lender than a voluntarily elected new loan. *General Motors Acceptance Corporation v. Jones,* 999 F.2d 63, 68 (CA3 1993).

In summary, pursuant to § 506(b), as an oversecured creditor, Glendale is entitled to interest at the contract rate on the arrearages until the effective date of confirmation of debtor's plan. After confirmation Glendale is entitled to interest under the *United Carolina Bank* rule, that is, at the rate currently charged in the secured creditor's lending market for similar loans in the area less the cost incurred by the lender in obtaining such loans. However, the interest rate is capped at the contract rate to which the secured credit—or originally agreed.

Because of such variations among the lenders, including size, number of loans, size of loans made, cost of operations, investment policy, among others, there can be no universal one-size-fits-all pronouncement as to the deductions for the lender's expense. In the absence of agreement, that fact must be ascertained after full discovery on a case by case basis.

An order will be entered in accordance with the foregoing.